**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN GONZALEZ and | ) | |
| STEFANY M. CARDENAS, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-7080 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| MICHAEL G. SCALETTA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Chicago Police Department received a 911 call about a young woman who might harm herself. Officers promptly arrived at her home for a wellness check. They knocked, but no one came to the door. So they decided, in the heat of the moment, to go in.

As it turns out, the young woman, Plaintiff Stefany Cardenas, wasn't home. But her stepfather, Plaintiff Juan Gonzalez, was there. And he was more than a little surprised to see police officers standing in his home, with guns drawn. The police directed him to sit on the couch while they searched the place. They didn't find her, so they left.

Cardenas and Gonzalez later filed suit, bringing claims for illegal entry and unlawful search. They claim that the police had no legitimate justification for entering the home. They also allege that the search was unreasonable, in both scope and duration. According to them, the police looked in too many places, and stayed too long.

After extensive discovery, Defendants moved for summary judgment. They invoked the emergency aid exception under the Fourth Amendment. They asserted qualified immunity, too.

They also asserted judicial estoppel against Gonzalez because he failed to disclose this potential claim when he filed for bankruptcy more than a year after the incident.

For the reasons stated below, the motion for summary judgment is granted in part and denied in part on the claims brought by Cardenas. The officers received a call about a young person who might be suicidal, so the emergency aid exception protected their decision to enter the home. Qualified immunity protected that decision, too. But there is a genuine issue of material fact about the reasonableness of the search, meaning where they looked and how long they took.

The Court grants summary judgment to the Defendants on all claims brought by Gonzalez. The doctrine of judicial estoppel protects the integrity of judicial proceedings, and penalizes litigants who play fast and loose with the courts. Here, the search took place in 2015. Gonzalez retained his current counsel in 2016 to investigate a potential claim. He then filed for bankruptcy in 2017, and represented under oath that he had no potential claims.

The Court finds that Gonzalez failed to disclose a potential claim, and did so intentionally. After telling the bankruptcy court that he had no claims of any value, he cannot tell a jury that he has a valuable claim.

## Background

On October 1, 2015, Plaintiff Stefany Cardenas was running late for work, and not for the best of reasons. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 4 (Dckt. No. 125). She was arrested the night before, and she didn't leave the police station until 3:00 or 4:00 in the morning. *See* Cardenas Dep., at 43:2-4 (Dckt. No. 124-12). She worked as a bank teller at Bank of America, and she was scheduled to start at 8:30 a.m. *Id.* at 43:13-14; *see* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 2 (Dckt. No. 133). That's not a lot of time for sleep.

She called her boss, Maria Santiago, to let her know that she would be late. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 4 (Dckt. No. 125). The record does not reveal when she called, or whether she predicted when she would arrive. But Cardenas told her boss about the arrest during that phone call. *See* Cardenas Dep., at 44:18-20 (Dckt. No. 124-12) ("That morning when I had called her to let her know I was going to be late, I let her know it was because I was – I had been arrested the night prior.").

Cardenas didn't show up until 11:00 a.m., two and a half hours late. *Id.* at 43:15-17. When Cardenas arrived, Santiago pulled her into an office to talk. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 125); *see also id.* ("[P]laintiffs admit that Stefany's supervisor talked to her about being late to work.").

Cardenas was "clearly upset" during the meeting, but she wasn't crying. *Id.* at ¶ 7; Cardenas Dep., at 45:16-20 (Dckt. No. 124-12). She divulged that she had been arrested not once, but twice that week. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 3, 6 (Dckt. No. 125). Her boss wasn't thrilled to hear it. In fact, Santiago told her that she potentially could lose her job. *See* Cardenas Dep., at 46:17-19 ("After these arrests, my manager informed me that I could potentially be terminated based on what they found; and there was going to be an investigation.").

Santiago picked up on the fact that Cardenas was upset, so she asked if Cardenas wanted to talk with a counselor from the bank's employee assistance program. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 125). Cardenas called the counselor a short time later, and they spoke for 10 to 20 minutes. *Id.* at ¶ 8. She shared that she was "extremely upset about potentially losing her job and about the recent ending of a personal relationship." *Id.*; *see also*

Cardenas Dep., at 46:15-16 (Dckt. No. 124-12) ("They asked me how I'm doing, and I let them know that I'm just extremely overwhelmed about everything.").

After she hung up, Cardenas reached out to Santiago again. She said that she "wasn't okay" and "needed to leave." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 125). Santiago allowed her to leave work early. *Id.* Cardenas testified that the second conversation took place at some point between 11:00 a.m. and 1:00 p.m. *See* Cardenas Dep., at 47:14-16 (Dckt. No. 124-12). She then left.[1]

After Cardenas left work, Santiago called 911. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 125). The parties disagree about what, exactly, Santiago told the 911 operator. But it is undisputed that the dispatcher then reached out to officers on the beat, and directed them to check on Cardenas.

Minutes after the 911 call, the Chicago Police Department dispatched two nearby officers, Gina Liberti and Greg Giuliani, to the home of Cardenas for a well-being check. *Id.* at ¶ 11; Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 10 (Dckt. No. 133). They were in the area, in separate marked squad cars. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 4.

The dispatcher called them on the police radio. Officer Giuliani testified about what he heard when he received the call:

> Q:    Okay. So if you look at – on page – it's marked as page 3. It's FCRL304. It's the fourth row down. It shows that the dispatcher put out a call for a well-being check at 1347, 10 hours?
>
> A:    Yes.

---

[1] The police did not know the full backstory about the back-and-forth between Cardenas and her boss before they entered the home. In fact, they didn't even know her name, let alone know the details of her troubles at work. So, in that sense, the details of their colloquy are not relevant to the officers' decision to enter the home. Still, the Court provides the full background for context, and to tell the broader story. What matters is what the officers knew when they entered the home.

Q:      Did you – do you recall hearing that on the radio?

[Counsel's objection to form]

A:      I believe that call was dispatched to me.

Q:      Okay.  What – what were you told about why you needed to go over to this house?

[Counsel's objection to form]

A:      In so many words, it was a check the well-being, a young female threatening to hurt herself, threatening to commit suicide.

*        *        *

Q:      Okay.  And do you recall any more detail about what the dispatcher told you about why a well-being check was needed?

A:      That I – the only thing I can recall is that a young woman was threatening to hurt herself.

*See* Giuliani Dep., at 47:7-25, 50:5-9 (Dckt. No. 124-15).  Officer Giuliani later repeated the

point, testifying that he heard about a girl who might harm herself:

Q:      And what – what was the matter of exigence, exactly?

A:      That the description of the call given to me was that a young teenage girl was threatening to commit suicide, threatening to hurt herself.

*Id.* at 57:16-20.

Officer Giuliani testified that he first learned about the situation when he received the call

on his radio:

Q:      And did you receive this information over the radio?

A:      Yes, I did.  It was given to me as a radio assignment.

*Id.* at 48:9-12; *see also id.* at 89:15-18 ("All I remember is over the air, you know, threatening to

hurt herself, threatening to commit suicide.  That's all I remember over the air.").

5

Officer Liberti received a call from the dispatcher, too. (Or maybe *the* call. The parties don't explain if Officer Giuliani and Officer Liberti received the same call, or different calls. Again, they were in different squad cars. The Court does not know if the same call is broadcast to more than one car, all at once.). Officer Liberti testified that the dispatcher directed her to check on the well-being of a girl:

> Q: Okay. So directing your attention to approximately two – excuse me – to – excuse me – 1:45 p.m. on October 1, 2015. At some point did you respond to a dispatch to go to 4819 North McVicker?
>
> A: Yes.
>
> Q: Okay. And what did you learn that led you to go to that location?
>
> A: I responded to a call from our dispatcher. It was a call of a check well-being of a girl.
>
> Q: Okay. What did you recall being told by the dispatcher?
>
> A: That was it.
>
> Q: Check the well-being of a girl?
>
> A: Yes.

*See* Liberti Dep., at 57:18 – 58:6 (Dckt. No. 124-14); *see also id.* at 13:13-25 (explaining radio calls from dispatchers).

She later added: "[T]he only information we got was check the well-being, that we're looking for a girl. That's it." *Id.* at 75:22-24. "Just the only information we had was what our dispatcher told us." *Id.* at 123:13-14. And in her view, a call to check on the wellbeing of someone could mean just about anything: "Could have been someone sick, injured, possibly threatening suicide. Someone needs help from the police. It's – it could be anything." *Id.* at 66:20-22; *id.* at 90:18-20 ("We're looking for a young girl. We don't know what's going on. We don't know if she's down in the basement or is hurt or in distress.").

In addition to the call on the radio, the 911 operator also prepared a written dispatch that described the 911 call from Bank of America.[2] The dispatch stated:

> c/s [*i.e.*, caller says] an employee came to work very distraught, over events that happened this week c/s she stated she was depressed, they let her talk to their employee asst. center and they told her to go get evaluated.........c/s they have not been able to get in touch w/her since she left.....they would like to have her car [sic] maria santiago [phone number], and please let her know that she is ok....caller thinks this maybe [sic] and apt but doesn[']t know apt #...........nfi [*i.e.*, no further information][3]

*See* Service Call Details (Dckt. No. 124-8) (ellipses in original).[4] The dispatch included her address, too. *Id.* And it identified the caller as Bank of America. *Id.*

Notice a few things. The dispatch described the employee as "very distraught" and "depressed." *Id.* It referred to "events that happened this week," but didn't reveal what those events were. *Id.* The employee talked with the "employee asst. center," and the bank "told her

---

[2] Plaintiffs object to the dispatch as hearsay. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 125). The hearsay rule applies when an out-of-court statement is offered for its truth. *See* Fed. R. Evid. 801(c). But here, the document isn't offered for its truth. The dispatch has a bearing on the knowledge and state of mind of the officers who (may have) read it. Also, Plaintiffs relied on the very same document in support of *their* motion for summary judgment (which Judge Castillo denied) and *their* response to Defendants' motion. *Compare* Service Call Details (Dckt. No. 111-4) (the copy filed by Defendants, which prompted an objection from Plaintiffs), *with* Service Call Details (Dckt. Nos. 110-8, 124-8) (the copies of the same document, filed by Plaintiffs). That said, Plaintiffs rightly call attention to the fact that the summary of the dispatch by Defendants isn't quite right. Defendants claim that "Santiago sent Cardenas to be evaluated by a *hospital*," and they cite the dispatch as support. *See* Defs.' Statement of Undisputed Facts, at ¶ 10 (Dckt. No. 111) (emphasis added); *see also* Service Call Details (Dckt. No. 124-4). But the dispatch did not say anything about a hospital. The dispatch says that Bank of America "told her to go get evaluated." *See* Service Call Details (Dckt. No. 111-4). It would not be unreasonable to interpret the phrase "go get evaluated" to mean "go get evaluated by a hospital," but that's not the only possible interpretation.

[3] Officer Scaletta testified that "c/s" means "caller says." *See* Scaletta Dep., at 105:11-19 (Dckt. No. 124-13). And "nfi" means "no further information." *Id.* at 106:5-8.

[4] There are a few different copies of the dispatch in the record. It appears in a document called Service Call Details (Dckt. No. 111-4) and a document called Event Query (Dckt. No. 111-7). Defendants filed unredacted versions. Plaintiffs also filed the Service Call Details (Dckt. No. 124-8), and filed a document called Event Query (Dckt. No. 124-7), but the formatting of the latter document (Dckt. No. 124-7) is different than the version filed by Defendants (Dckt. No. 111-7). Also, Plaintiffs redacted part of the substance of the dispatch in the Event Query (Dckt. No. 124-7), even though the unredacted version appears in Defendants' version and in Plaintiffs' copy of the Service Call Details (Dckt. No. 124-8).

to go get evaluated." *Id.* But since she left work, the bank could not get ahold of her. There was an expression of concern, too: "please let her know that she is ok." *Id.*

There is some wiggle room in the record about whether Officer Giuliani and Officer Liberti ever saw the dispatch, meaning the written notice itself (in addition to the call on the radio). The parties – especially the *Plaintiffs* – take it as a given that the officers saw the written message from the dispatcher.

For example, in their response to Defendants' statement of facts, Plaintiffs agreed that "the following information *was given* from the dispatcher to police officers," and then quoted the written dispatch. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 125) (emphasis added); *see also* Pls.' Statement of Facts, at ¶ 26 (Dckt. No. 107) (same). According to Plaintiffs, the "defendant officers *would have seen* the text of this oral service call almost verbatim as a text message on their in-car computers." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 125) (emphasis added); *see also* Pls.' Statement of Facts, at ¶ 27 (Dckt. No. 107) (same).

In their filings, Defendants agree that they "would have seen" the written dispatch. In their statement of additional facts, Plaintiffs stated that the "defendant officers *would have seen* the text of the oral service call contained in the event report from the Office of Emergency Management and Communications," and then quoted the written dispatch. *See* Pls.' Statement of Additional Facts, at ¶ 13 (Dckt. No. 123) (emphasis added). Defendants agreed, responding: "Defendants admit." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 13 (Dckt. No. 133).

So, the parties seem to agree that the officers "would have" seen the written dispatch. But the supporting testimony was wishy-washy, at best. Officer Giuliani testified about the call

on the radio, but he did not remember receiving any additional information. *See* Giuliani Dep.,

at 48:23 – 49:1 (Dckt. No. 124-15). He testified that the dispatcher "probably" would have sent

it to him, but he didn't recall receiving it. After Plaintiffs' counsel marked and read the dispatch,

counsel elicited the following testimony:

> Q: So the – the remarks that I just read, do you recall being given
> those remarks from the dispatcher?
>
> A: I don't recall. That was a long time ago. But if it was available,
> probably would have sent it to me or given it over the air, if that
> helps any.
>
> Q: If you had an in-car computer, would that information have come
> in on your in-car computer?
>
> A: If it was updated from the dispatcher.

*Id.* at 51:24 – 52:8. Notice the play in the joints: he didn't recall seeing the written dispatch, but

the dispatcher "probably" would have sent it "if it was available." *Id.* And it would have come

to his in-car computer "if" it was updated from the dispatcher. *Id.*

Officer Liberti, for her part, did not testify about whether she ever saw the written

dispatch. The parties cite no supporting testimony from Officer Liberti on this point (meaning

whether she ever saw the written dispatch). Based on the Court's review of the transcript, she

wasn't asked.

In sum, Officers Giuliani and Liberti testified about what they heard the dispatcher say

when they received a call on the radio. The two officers did not testify that they actually read it.

But the parties seem to agree that they "would have" received the written dispatch, too. So the

Court will accept, as a stipulation within the meaning of Rule 56, that the officers "would have

seen" the written dispatch, in addition to receiving the radio call.[5]  *See* Fed. R. Civ. P. 56(c)(1)(A) (allowing a district court to consider "stipulations").

The parties agree that everything the officers knew came from the dispatcher.  *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 12, 22 (Dckt. No. 133).  They did not speak with anyone from Bank of America.  They did not listen to the 911 call, either.  *Id.*  They did not know the age of the "girl," or whether she was home.  *Id.* at ¶¶ 10–11; Liberti Dep., at 58:19-23 (Dckt. No. 124-14) (stating that "all they said was 'girl'"); *id.* at 75:15 – 76:8 (stating that the officers did not know if the girl was home).

Turning back to the story, Officers Liberti and Giuliani knocked on the door when they arrived.  *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 23 (Dckt. No. 133).  Officer

---

[5]  Plaintiffs attempt quite a maneuver, attempting to flip the testimony to mean that the officers knew **only** what was in the written dispatch.

In response to Defendants' statement of facts, Plaintiffs contend that "[w]hen confronted with the text of the dispatcher communication, defendant Giuliani admitted that he did not know anything outside of what the dispatcher had typed as remarks in the Event Query."  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 125) (citing Giuliani Dep., at 52–53 (Dckt. No. 124-15)).  That's not a fair depiction what Officer Giuliani actually said.  He repeatedly testified about the oral dispatch that he received over the radio.  *See, e.g.*, Giuliani Dep., at 47:7 – 48:12, 50:5-9, 53:8-10.  He testified:  "All I remember is that I got a call about a girl that was said to be threatening suicide."  *Id.* at 53:8-10; *see also id.* at 91:18-21 (agreeing that the written dispatch "might not be the complete information that was given to you before you arrived at the address").  In response to the requests to admit, Officer Giuliani *denied* that the information in the Search Call Search (*i.e.*, the written dispatch) was "the only information he or she had regarding" the exigency of the situation.  *See* Giuliani Resp. to Request to Admit, at ¶ 15 (Dckt. No. 124-3).  That answer was consistent with the notion that he received information orally, during the radio call.  In response to Defendants' statement of facts, Plaintiffs point to the next bit of testimony, where Officer Giuliani was asked if he had "any other information outside of what was in these remarks," and he said "[t]hat's all I recall."  *See* Giuliani Dep., at 53:16-18; Pls.' Resp. to Defs.' Statement of Undisputed Facts, at ¶ 17.  No reasonable person would interpret that answer as a retraction of his repeated testimony about what he heard during the call over the radio.  He squarely testified that he remembered that radio call, but didn't recall the written dispatch.  In fact, he testified about that very subject only two questions earlier.

Here's the bottom line:  Officer Giuliani did not testify that he knew the information in the written dispatch, and **only** the information in the written dispatch.  Plaintiffs are standing the evidence on its head.  The officers testified that they remembered only the oral call (and not the written dispatch), but Plaintiffs turn it upside down and argue that the officers knew **only** what was in the written dispatch.

Giuliani testified that he did not announce himself as a police officer when he arrived at the door. *See* Giuliani Dep., at 56:9 – 57:5 (Dckt. No. 124-15); *see also id.* at 57:5 ("There was no reason to."). But Officer Liberti testified that she did, in fact, identify herself as a police officer:

> Q:  Did you say anything directed at any occupants of the house when you were outside the house? Did you say anything at – when you were knocking at the door?
>
> A:  Yes. "Police, police." That's probably about it.
>
> Q:  Police, police.
>
> A:  Police, yes.
>
> Q:  Okay. Did you –
>
> A:  "Hello. Police."
>
> Q:  Did Giuliani say anything?
>
> A:  I don't recall.

*See* Liberti Dep., at 80:7-18 (Dckt. No. 124-14). So one of the two officers testified that she announced herself as the police (and there's no evidence that she didn't).[6]

No one answered the door. Officer Liberti tried the doorhandle, and found it unlocked. So the two officers walked right in. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 14–16 (Dckt. No. 125); *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 24 (Dckt. No. 133). They had no warrant, and no permission to enter.

---

[6] In their statement of facts, Plaintiffs contend that the officers did not announce themselves as the police when they were at the front door. *See* Pls.' Statement of Additional Facts, at ¶ 23 (Dckt. No. 123). But Plaintiffs cite the testimony of Officer Giuliani only. *Id.* Officer Liberti testified that she did, in fact, announce herself as the police. *See* Liberti Dep., at 80:7-18 (Dckt. No. 124-14). That testimony is not inconsistent with the testimony of Officer Giuliani. Officer Giuliani testified that *he didn't* identify himself as a police officer, and Officer Liberti testified that *she did* announce herself as a police officer. Each person testified about what they personally did, without undermining the other person's testimony.

At that point, the officers had no way of knowing who, if anyone, was inside, or what they were doing. But as it turned out, Stefany Cardenas was not there. But her stepfather, Juan Gonzalez, was at home in the basement.

Once inside, the officers announced their presence. They called out: "Who's in here? Chicago Police." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 125). Their guns were drawn. *Id.* at ¶ 20; *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 26 (Dckt. No. 133).

The officers didn't find anyone on the main floor, but they heard someone in the basement. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 19 (Dckt. No. 125). That was Plaintiff Gonzalez, and he heard them too. He realized that they were officers when they announced their presence. *Id.* at ¶ 21; Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 28 (Dckt. No. 133).

The parties dispute what happened next. The officers claim that they ordered the person in the basement to come upstairs, but he refused. *See* Defs.' Statement of Undisputed Facts, at ¶ 21 (Dckt. No. 111). According to Defendants, Officers Liberti and Giuliani then called for backup. *Id.* at ¶ 22. Four other officers – Sergeant Michael Scaletta and Officers Gregory Schoen, Chris Maksud, and Sam Bubalo – heard the call and arrived on the scene. *Id.* at ¶ 23.

Plaintiffs tell a different story. Plaintiffs contend that Gonzalez came upstairs "immediately" after he realized officers had entered his home. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 125). That's a bit of an overstatement. Gonzalez testified that he came upstairs, but he didn't testify (in the cited pages, anyway) that he came upstairs immediately. *See* Gonzalez Dep., at 32, 43–45 (Dckt. No. 124-11).

Whatever the delay (if any), Gonzalez came upstairs and discovered police officers in his home. Officer Liberti pointed a gun at him. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 28 (Dckt. No. 133). He saw Officers Giuliani, Maksud, and Schoen with their guns out, too. *Id.*; Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 23–24 (Dckt. No. 125). Gonzalez saw five to ten officers in his home.[7] *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 28; Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 31.

Officer Liberti pointed a gun toward Gonzalez for between five and fifteen seconds, and didn't say anything. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 31–32 (Dckt. No. 125). The police ordered Gonzalez to sit on the couch, and stay on the couch. *Id.* at ¶¶ 33, 35.

Gonzalez said that he wanted to talk with a lawyer (though he didn't have one). *Id.* at ¶ 34. He also asked the officers if they had a warrant, and told them to leave. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 31 (Dckt. No. 133). He was "very upset" that police officers were in his home without a warrant. *Id.*

According to Gonzalez, Officer Maksud lunged at him, but Sergeant Scaletta held his fellow officer back. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 125). Defendants deny it, but the fact is not material. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 34 (Dckt. No. 133). Gonzalez admits that there was no physical contact at any time – the police did not touch him or restrain him. *See* Gonzalez Dep., at 82:8-16 (Dckt. No. 124-11);

---

[7] The parties disagree about whether Officer Bubalo entered the home, too. The parties agree that Officer Bubalo arrived outside the home when the other officers called for backup. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 125). Officer Bubalo testified that he stayed in his vehicle, and did not enter the home. *See* Bubalo Dep., at 51:9-15 (Dckt. No. 124-16). Gonzalez did not squarely contradict him. Gonzalez testified that "five to ten police officers" entered his home. *See* Pls.' Statement of Additional Facts, at ¶ 31 (Dckt. No. 123); Pls.' Resp. to Defs.' Statement of Facts, at ¶ 25; Gonzalez Dep., at 32:15-18 (Dckt. No. 124-11). Defendants agree. But testimony about the number of officers is not the same thing as testimony about the identities of those officers. There is evidence that Officer Bubalo arrived outside the home, but there is no testimony that Officer Bubalo *entered* the home.

13

*see also* 1/4/19 Bankr. Tr., 07:52 – 09:13 (Dckt. No. 180); 3/3/21 Tr., at 24:19-21 (Dckt. No. 201).

A search followed. The officers began to search the home, room by room, looking for Cardenas. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 125). But Cardenas wasn't home, so they didn't find her. *Id.* at ¶ 47. The officers did not attempt to contact Cardenas, and did not ask Gonzalez to call her. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 30 (Dckt. No. 133).

The parties disagree about the extent of the search. Defendants state that they were looking for Cardenas, and that they moved only the covers on her bed. *See* Defs.' Statement of Undisputed Facts, at ¶¶ 41, 43 (Dckt. No. 111). "In every other area that Gonzalez believed the police searched, nothing was out of place." *Id.* at ¶ 45.

According to Plaintiffs, the officers made a mess of things. They assert that the officers were not only looking for Cardenas. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 125). "Defendants searched through the entire house, the second floor, the first floor, and the basement, including under bedcovers and inside of drawers." *Id.* Gonzalez and Cardenas each testified that their bedrooms were in disarray, and that items in their drawers had been moved around. *Id.* at ¶¶ 43–44; *see also* Pls.' Statement of Additional Facts, at ¶ 39 (Dckt. No. 123). According to Cardenas, the officers had "gone . . . into the drawers in her dresser, including the drawer in which she kept her underwear." *See* Pls.' Resp. to Defs.' Statement of Undisputed Facts, at ¶ 43.

The parties disagree about how long the officers were inside the home. The officers claim that they stayed only 10 to 15 minutes. *See* Defs.' Statement of Undisputed Facts, at ¶ 46 (Dckt. No. 111). But Gonzalez testified that the officers were there for "35–45 minutes." *See*

Pls.' Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 125). The "Event Query" indicates that the 911 call came through at 1:36 p.m., the dispatch occurred at 1:47 p.m., and the event was closed at 2:22 p.m. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 36 (Dckt. No. 133). The officers deny that this timeline implies that they were physically present in the home the entire time. *Id.*

In the end, the police officers did not find Cardenas. So they left.

Taking a step back, the parties disagree about a number of details, but the overarching story is undisputed. The Chicago Police Department dispatched Officers Giuliani and Liberti to the home in question to perform a wellness check for a distraught "girl." They entered after knocking, and announced themselves as the police once inside (if not before). They conducted a search, but did not find Cardenas because she was not home. But Gonzalez was there, and the police required him to sit on the couch while the police looked around the place. The officers did not touch him. The whole episode lasted 45 minutes (tops), or maybe much less.

### Procedural History

Gonzalez and Cardenas filed suit in September 2017. *See* Cplt. (Dckt. No. 1). They brought five claims against more than a dozen officers, plus the City of Chicago.

Both Plaintiffs bring the first two claims. Count I is a claim for both illegal entry and unlawful search. They fault the police for entering their home without a warrant, without probable cause, and without permission. So Count I challenges both the entry into the home, and the search of the home.

Count II is another claim for unlawful search. But instead of challenging the fact of the search, Plaintiffs challenge its scope and duration. They claim that the search was too wide, and lasted too long.

15

Count III is a claim for illegal detention by Gonzalez (only). He alleges that the police wrongfully detained him during the search.

Count IV is a claim by both Plaintiffs against Sergeant Scaletta (only).

Count V is a claim against the City of Chicago for indemnification.

The parties embarked on extensive discovery. *See* 1/23/18 Order (Dckt. No. 40); 7/31/18 Order (Dckt. No. 78). In the final months, Plaintiffs voluntarily dismissed nine defendants. *See* 7/19/18 Order (Dckt. No. 75); 8/22/18 Order (Dckt. No. 87).

The parties filed cross motions for summary judgment. *See* Pls.' Mtn. for Summ. J. (Dckt. Nos. 106); Defs.' Mtn. for Summ. J. (Dckt No. 108). Plaintiffs argued that the police did not have a warrant, and that the emergency aid exception did not apply.

Judge Castillo (this Court's predecessor, before reassignment) ruled on one of the two summary judgment motions. Judge Castillo denied Plaintiffs' motion for summary judgment at a hearing one week after filing. *See* 6/25/19 Order (Dckt. No. 115).

In the accompanying Order, Judge Castillo explained that the parties offered "competing versions of the facts." *See* 6/25/19 Order, at 1 (Dckt. No. 116). In the Court's view, Plaintiffs "proffer[ed] facts showing that there was no emergency justifying Defendants' warrantless entry," and Defendants "proffer[ed] facts showing that they had a reasonable basis to believe that they needed to enter Plaintiffs' home without a warrant and vigorously search Plaintiffs' home to save Plaintiff Stefany Cardenas' life." *Id.* Judge Castillo concluded that the "dueling versions of the facts" precluded judgment in Plaintiffs' favor on the claims about an unlawful entry and an illegal search. *Id.* at 1–2. The Court also concluded that the "competing accounts" precluded summary judgment in favor of Plaintiffs on the remaining counts. *Id.* at 2.

Defendants filed a motion for summary judgment, too. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 108). That motion remained pending when this case was reassigned.

Defendants' motion for summary judgment covered some of the same ground as Plaintiffs' motion for summary judgment. But there was one major exception. Defendants moved for summary judgment based on judicial estoppel.

Gonzalez, it turns out, filed for bankruptcy in January 2017. He filed the bankruptcy petition eight months before filing this lawsuit in September 2017, but more than a year after the incident in 2015. He had to list his assets as part of that bankruptcy filing.

But Gonzalez never mentioned any potential claims when he made representations to the bankruptcy court about his assets. He never disclosed anything about the incident with the police. He ultimately received a discharge without disclosing the potential claims against the police as an asset. After his non-disclosure came to light in his deposition in this case, Gonzalez went back to the bankruptcy court and finally informed the trustee.

According to Defendants, Gonzalez intentionally failed to disclose his claims as a potential asset, and thus committed a fraud on the court. So, in their view, Gonzalez cannot bring those claims now.

Judge Castillo ruled on Plaintiffs' motion for summary judgment. So this Court's task is to rule on the motion for summary judgment filed by Defendants.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

17

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Discussion

### I. Illegal Entry (Count I)

The first claim is about the entry into the home. Plaintiffs claim that the officers violated their Fourth Amendment rights when they entered their home without a warrant and without permission.

Defendants argue that the entry was reasonable under the emergency aid exception. They also contend that qualified immunity applies. The Court agrees.

#### A. The Emergency Aid Exception

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const.

amend. IV. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted).

"The 'very core' of this guarantee is 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). The Supreme Court has emphasized the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," because the home "provide[s] the setting for those most intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver v. United States*, 466 U.S. 170, 178–79 (1984) (cleaned up); *see also Jardines*, 569 U.S. at 6 ("But when it comes to the Fourth Amendment, the home is first among equals."). In life, and under the law, home is a special place.

But the text of the Constitution does not prohibit all entries into a home. "To be sure, the Fourth Amendment does not prohibit all unwelcome intrusions 'on private property,' – only 'unreasonable' ones." *Caniglia*, 141 S. Ct. at 1599 (citation omitted). The primary exception, of course, is a search or seizure conducted with a valid warrant. *Id.* Exigent circumstances create another exception.

Under the exigent circumstances doctrine, officers can enter and search a home without a warrant when the situation requires them to act quickly. *Id.*; *Brigham City*, 547 U.S. at 403 ("[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.") (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)). Officers don't always have time to get a warrant, and

19

the sensitivities of the situation may require immediate action. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014) ("[A] warrantless entry into a dwelling may be lawful when there is a pressing need for the police to enter but no time for them to secure a warrant.").

Examples of exigent circumstances include the destruction of evidence, the hot pursuit of a suspect, or a risk that a suspect may escape. *Id.*; *see also id.* at 560 ("Exigency cases thus typically speak either of there being probable cause to believe a crime is being or has been committed or of the need to act in order to fulfill the probable cause requirement, as by preventing a suspect from fleeing or preserving evidence that might otherwise be destroyed.").

Exigent circumstances sometimes involve criminality, but not always. Sometimes police respond to emergencies that don't involve crimes. That reality gave rise to the emergency aid doctrine, which is a subcategory of the exigent circumstances doctrine.[8] *Id.* at 553 (noting that the Supreme Court has deemed the emergency aid exception to be a "subset of the exigent circumstances doctrine"); *Brigham City*, 547 U.S. at 403 ("One *exigency* obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.") (emphasis added).

---

[8] A related exception is the community caretaking doctrine. "The community caretaking doctrine recognizes that police sometimes take actions not for any criminal law enforcement purpose but rather to protect members of the public . . . ." *Sutterfield*, 751 F.3d at 553; *see also Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) ("Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."). Until recently, there was a circuit split about whether the community caretaking doctrine applies to homes. *See Sutterfield*, 751 F.3d at 554. While the motion for summary judgment was pending, the Supreme Court decided *Caniglia v. Strom*, 141 S. Ct. 1596 (2021). The Supreme Court ruled that the community caretaking doctrine is limited to cars and does not apply to homes. *Id.* at 1598; *id.* at 1600 ("What is reasonable for vehicles is different from what is reasonable for homes.").

The emergency aid doctrine "recognizes that a warrantless entry into the home may be appropriate when police enter for an urgent purpose other than to arrest a suspect or to look for evidence of a crime." *Sutterfield*, 751 F.3d at 557; *see also Gaetjens v. City of Loves Park*, 4 F.4th 487, 492 (7th Cir. 2021); *Caniglia*, 141 S. Ct. at 1599 ("We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist . . . .").

An urgent purpose includes "the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Caniglia*, 141 S. Ct. at 1599 (quoting *Kentucky v. King*, 563 U.S. 452, 460, 470 (2011)); *see also Michigan v. Fisher*, 558 U.S. 45, 49 (2009); *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) ("'The Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid.'") (quoting *Mincey*, 437 U.S. at 392); *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) ("Reasonable fear for the safety of a person inside a premises is one such exigent circumstance."). A threat to personal safety may create an urgent need for immediate action. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City*, 547 U.S. at 403 (quoting *Mincey,* 437 U.S. at 392).

A suicide threat counts as an exigent circumstance. *See Sutterfield*, 751 F.3d at 557 (stating that one of the "[r]ecognized exigencies" is a "danger of imminent injury," including "suicide"); *Fitzgerald*, 707 F.3d at 731–32; 3 Wayne R. LaFave, *Search and Seizure* § 6.6(a) (6th ed. 2020) ("Doubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made to thwart an apparent suicide attempt . . . .").

If a person is in danger, it does not matter who the danger comes *from*. It makes no difference if the threat comes from someone else, or if the threat comes from the person in need. If the police can enter a home because Person X is about to harm Person Y, then the police can enter a home because Person X is about to harm Person X.

The emergency aid doctrine reflects the realities of day-to-day, boots-on-the-ground police work. Police do more than investigate crimes. Members of the community call the police for all sorts of needs, and crime prevention and investigation is only part of their job. Sometimes, for example, there is a call for help when there is no crime. For that reason, "courts from the United States Supreme Court on down have long recognized the important role that police play in safeguarding individuals from dangers posed to themselves and others – a role that will, in appropriate circumstances, permit searches and seizures made without the judicial sanction of a warrant." *Sutterfield*, 751 F.3d at 551.

The exigent circumstances doctrine "is judged by an objective standard: we ask whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." *Id.* at 557. An objective standard governs the emergency aid doctrine, too. "The test for this exception is also objective: the question is whether the police, given the facts confronting them, reasonably believed that it was necessary to enter a home in order to render assistance or prevent harm to persons or property within." *Id.* at 558 (cleaned up). "The officers' subjective motive for the entry – be it to quell violence or to make an arrest, for example – is irrelevant; what matters is whether the facts, viewed objectively, justified the action taken by the police." *Id.*

Police sometimes act to prevent harm, and rightly so. They do not need to sit back, and wait for something bad to happen. "[I]t would be silly to suggest that the police would commit a

tort by entering . . . to determine whether violence . . . has just occurred or is about to (or soon

will) occur . . . ." *Georgia v. Randolph*, 547 U.S. 103, 118 (2006); *see also Brigham City*, 547

U.S. at 406 ("The role of a peace officer includes preventing violence and restoring order, not

simply rendering first aid to casualties . . . ."); *United States v. Bell*, 500 F.3d 609, 612 (7th Cir.

2007).

The reasonableness of the conduct depends on what the police knew at the time, not what

they learned later. "The reasonable belief must be based on actual knowledge the officers had at

the time of the entry, rather than on knowledge acquired after the fact." *Fitzgerald*, 707 F.3d at

730; *see also United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) ("[T]he government must

establish that the circumstances as they appeared at the moment of entry would lead a

reasonable, experienced law enforcement officer to believe that someone inside the house,

apartment, or hotel room required immediate assistance.").

### B.       Applying the Emergency Aid Doctrine

The case at hand fits comfortably within the emergency aid doctrine. Officers Giuliani

and Liberti received a call from the dispatcher to perform a well-being check. The situation was

objectively serious, by any possible measure. The dispatcher reported that a girl was threatening

suicide.

Officer Giuliani testified about the substance of the radio call. "In so many words, it was

a check the well-being, a young female threatening to hurt herself, threatening to commit

suicide." *See* Giuliani Dep., at 47:23-25 (Dckt. No. 124-15). And again: "the description of the

call given to me was that a young teenage girl was threatening to commit suicide, threatening to

hurt herself." *Id.* at 57:18-20; *see also id.* at 50:8-9 ("That I – the only thing I can recall is that a

young woman was threatening to hurt herself.").

There is no evidence that Officer Giuliani did not receive that call. And there is no evidence that the dispatcher said something else over the radio, either. By all appearances, Plaintiffs did not depose the dispatcher (or at the very least, there's no transcript in the record). The only testimony about what Officer Giuliani heard came from Officer Giuliani.

Plaintiffs apparently don't believe him. In their filings, Plaintiffs were rather pointed in their commentary about his testimony: "That was something Giuliani made up." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 125); *id.* at ¶ 17 ("Neither Liberti nor Giuliani had been given any information that a person was suicidal. This is made up."). That argument – which is only half a step above name calling – does not get Plaintiffs anywhere.

Plaintiffs basically argue that they aren't buying what he's selling. But a party cannot create a genuine issue of material fact by arguing that a witness is not credible. A plaintiff cannot "defeat a defendant's properly supported motion for summary judgment . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial . . . ." *See Anderson*, 477 U.S. at 256–57; *see also Fletcher v. Hoeppner Wager & Evans, LLP*, 775 F. App'x 240, 241 (7th Cir. 2019) ("Fletcher's evidence suggests only that a jury might disbelieve Golomb's evidence . . . . But a plaintiff cannot get to a jury simply by casting doubt on the defendant's evidence; '[i]nstead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'") (quoting *Anderson*, 477 U.S. at 257); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 361 (7th Cir. 1992) ("Scherer may not defeat Rockwell's properly supported summary judgment motion without offering any evidence from which a jury could determine that the alleged sexual harassment did not actually occur and

by merely asserting that the jury might disbelieve Rockwell's witness . . . ."). Trials don't happen based on "liar liar pants on fire."

Hurdling over the summary judgment bar requires evidence, not skepticism. *See* Fed. R. Civ. P. 56(c)(1) (requiring the non-moving party to offer evidence of its own, or show that the proffered evidence from the moving party does not support the motion). Officer Giuliani testified about what he heard, so Plaintiffs needed to come forward with contrary evidence of what Officer Giuliani heard. But instead, Plaintiffs come empty-handed. There's no contrary evidence in the record about what Officer Giuliani heard before he walked up to the door.

Officer Giuliani did not know for certain that the young person was threatening herself. And he didn't know why she was in peril. But he heard that she was threatening suicide, and that was enough. "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *See Fisher*, 558 U.S. at 49 (citation omitted). He may not have known the full details of the story, but he knew the headline, and the headline justified quick action.

Plaintiffs seem to think that Giuliani's testimony was incompatible with the content of the written dispatch. But they were not incompatible at all. The radio call described a suicidal person who was threatening to hurt herself. The written dispatch described a "very distraught" and "depressed" person who needed help and who went off the grid. *See* Service Call Details (Dckt. No. 124-8).

Those two pieces of information can live together, without any conflict. Suicidal people tend to be distraught and depressed. And even if there were conflict, Officer Giuliani could have acted based on the most serious version of the two.

25

True, the testimony from Officer Liberti did not reflect the same level of gravity. She testified that she received a radio call, and that the dispatcher directed her to do a well-being check on a girl. *See* Liberti Dep., at 57:23 – 58:6 (Dckt. No. 124-14). "It was a call of a check well-being of a girl." *Id.* at 58:1. The dispatcher did not give her the reason for the well-being check. *Id.* at 58:12-18. Unlike Officer Giuliani, Officer Liberti did not testify that the dispatcher mentioned suicide.

But it makes no difference. Officer Liberti entered the home with Officer Giuliani, and Officer Giuliani heard the dispatcher mention a possibility of suicide. Two officers could have entered the home as a team even if (hypothetically speaking) only one officer had received a call. A call to only one officer was enough. From a Fourth Amendment perspective, they were in for a penny, so they were in for a pound. If a policeman or policewoman could enter, then police*men* and police*women* could enter, too.

It was objectively reasonable for both officers to enter the home, even if only one of the two calls mentioned suicide. The Fourth Amendment did not require the officers to apply a default rule in favor of the least-serious version of the calls. The officers did not need to whittle it down, treating the least-serious call like a lowest common denominator. There's no presumption in favor of the least-serious version of events.[9]

The Seventh Circuit has applied the emergency aid exception in other cases involving a threat of suicide. In *Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013), a woman called a non-emergency number of a neighboring police department, and made statements that the officer interpreted as suicidal. *Id.* at 727–28. That officer kept her on the line while he called the police

---

[9] If someone told you "your house is on fire," and someone else said "your house is not on fire," you probably wouldn't ignore the first comment, and go about your business. And if you heard someone say "your house is on fire," and heard someone else say "there might be a problem at your house," you would probably head home.

in the woman's town and described a "very depressed" and possibly suicidal caller. *Id.* at 728. The dispatcher informed the officers that she had recently miscarried and had made suicidal statements. *Id.* She stayed on the line with the dispatcher the whole time, but when the officers approached her home, she hung up. *Id.*

The Court of Appeals concluded that it was objectively reasonable for the police to enter her home without a warrant. "They had been told that the woman inside had called a police station, that she sounded intoxicated, and that she had threatened suicide." *Id.* at 732. They knew that she had hung up, too. *Id.* Taken together, those facts "paint[ed] an objectively reasonable picture of an exigent circumstance." *Id.*

Here, too, Officer Giuliani received a radio call from the dispatcher about a person who was a danger to herself. The dispatcher sent him right away to look for a "young teenage girl" who "was threatening to commit suicide, threatening to hurt herself." *See* Giuliani Dep., at 57:18-20 (Dckt. No. 124-15). He didn't know why she was suicidal, and he didn't know every last detail. But he did hear that she was young – a "girl," who was "young" and "teenage." *Id.* The youth of the person added volatility. True, Cardenas turned out to be older, but it makes no difference because the officers did not know her true age at the time. The officers heard that a young person was in distress, and it was objectively reasonable to try to protect her from herself.

In *Sutterfield*, a psychiatrist at a hospital called 911 about a distressed patient. *See Sutterfield*, 751 F.3d at 545. She let the police know that a patient had just left an appointment after expressing suicidal thoughts, namely: "I guess I'll go home and blow my brains out." *Id.* She wore an empty gun holster to that appointment, driving the point home. *Id.*

The police couldn't find her. They visited her home, but she didn't respond, and a neighbor told them that she wasn't home. *Id.* But they did receive a follow-up call from the

psychiatrist a few hours later, who reported that his patient wanted her to "call off" the police search. *Id.*

They returned to the home that evening, more than eight hours after the first call. This time, she answered the knock at the door, but would not engage, and told them to leave. *Id.* at 546. After more officers arrived, she continued to refuse to let them in. *Id.* at 547. She said she was fine. *Id.* The officers then yanked the door open, and forcibly entered. *Id.*

Once again, the Seventh Circuit held that the emergency aid doctrine justified the warrantless entry into her home. The Court of Appeals concluded that there were exigent circumstances, even though more than eight hours had passed since the police received the tip. *Id.* at 560–62. The fact that the patient came to the door, and said that she was fine, was not enough to make the emergency go away. "[N]othing transpired at the front door of her home that might have put the police on notice that the emergency that had been reported by Sutterfield's physician . . . had dissipated." *Id.* at 561–62.

The Seventh Circuit warned against "second-guessing" the police on the scene, who faced a potential life-and-death situation. *Id.* at 562. "How were the officers to know that Sutterfield was competent to assess the state of her own mental health or that, regardless of what she herself said, there was no longer any risk that she might harm herself?" *Id.*

Here, too, the police received a call about a person who was threatening suicide. Unlike the officers in *Sutterfield*, the officers here did not speak directly with the source of the tip, and they didn't know the full backstory, either. But they did know that a young person was potentially in trouble. And unlike *Sutterfield*, they did not have the reassurance of seeing an alive-and-ostensibly-well person answer the door. When Officers Giuliani and Liberti knocked, no one answered. So they acted on the spot, and entered.

28

This Court, like the Seventh Circuit in *Sutterfield*, will not second-guess that decision. What, exactly, were the police supposed to do?  Officer Giuliani heard that a young person was threatening to kill herself.  When they knocked on the door, no one answered.  Were the police supposed to leave it at that, call it a day, and drive away?

Courts do not engage in second-guessing when police err on the side of protecting life in the heat of the moment.  "[W]hen police are acting in a swiftly developing situation . . . a court must not indulge in unrealistic second-guessing."  *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005) (quotation marks omitted).  As Chief Justice (then Judge) Burger once wrote, "the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct.  People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process."  *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J., concurring) (emphasis added).  Not everyone has the luxury of sitting back in chambers, taking the necessary time, figuring out what to do.

Viewed as a whole, it was objectively reasonable (and understandable) for the police officers to enter the home.  Preventing harm to young people is a high societal value.  And here, the police had enough information to reasonably believe that a tragedy might take place if they didn't act, and act right away.

### C.    Qualified Immunity

The entry into the home was objectively reasonable, based on what Officer Giuliani heard on the radio at the time.  But even if it were not, Plaintiffs still would not have a claim.  Qualified immunity would protect officers' decision to enter the home and check on her well-being.

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of

which a reasonable person would have known." *Sutterfield*, 751 F.3d at 572. Qualified immunity gives officers the benefit of the doubt when they make decisions without crossing well-established boundaries. "'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

"Once an officer asserts qualified immunity, a plaintiff can proceed with his case only if he can show (1) that the 'facts, taken in the light most favorable to [him], make out a violation of a constitutional right,' and (2) that right was 'clearly established at the time of the alleged violation.'" *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Id.* (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018)) (emphasis in original).

When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate "that the right is clearly established such that 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). To satisfy this standard, the right must have been clearly established "in a particularized sense, rather than at a high level of generality." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

Cardenas has not carried her burden. In response to the motion, Cardenas has not come forward with any case demonstrating that the officers violated a clearly established right. If

anything, the case law flows in the other direction. In *Fitzgerald* and *Sutterfield*, the Seventh Circuit allowed officers to enter homes without a warrant after receiving calls about a potential suicide. Cardenas offers no countervailing case law from the Seventh Circuit.

Instead, Cardenas argues that "qualified immunity is not appropriate" because "[t]he legal issues are dependent upon and are inseparable from disputed facts." *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 13 (Dckt. No. 126). She relies heavily on the written dispatch, and argues that the knowledge of the officers was confined to the four corners of that notice.

Plaintiffs argue that the officers knew only the information in the written dispatch, and nothing else. As a factual matter, that argument cannot get off the ground. Officers Giuliani and Liberti testified about the contents of a radio call from the dispatcher. As explained above (*see* footnote 5), the notion that the officers only knew the information in the written dispatch is simply not correct.

If anything, the evidence about whether the officers read the written dispatch is murky at best. But even if they read the dispatch, they would not un-hear what the dispatcher told them. Knowledge from the written dispatch would have supplemented, not superseded, knowledge learned from the call with the dispatcher.

And even if the officers read the dispatch, and knew nothing else (*i.e.*, without a radio call), Plaintiffs would not have a claim. Qualified immunity would protect the officers even if they responded to the written dispatch, without receiving the radio call.

The written dispatch did not exactly downplay the situation. Quite the contrary. The dispatch warned about a troubled woman who needed help. *See* Service Call Details (Dckt. No. 124-8). Specifically:

31

> c/s [*i.e.*, caller says] an employee came to work very distraught, over events that happened this week c/s she stated she was depressed, they let her talk to their employee asst. center and they told her to go get evaluated.........c/s they have not been able to get in touch w/her since she left.....they would like to have her car [sic] maria santiago [phone number], and please let her know that she is ok....caller thinks this maybe [sic] and apt but doesn[']t know apt #...........nfi [*i.e.*, no further information]

*Id.* (ellipses in original).

The dispatch described her mental state as "very distraught" and "depressed." *Id.* (Dckt. No. 124-8). The dispatch did not explain why she was upset, but it ominously referred to "events that happened" that week. *Id.* The employee received help from the "employee asst. center," but it was not enough. *Id.* Bank of America thought that she needed more help, and "told her to go get evaluated." *Id.*

The employee left work, and then went AWOL. *Id.* Her boss was trying to reach her, but could not get in touch with her. *Id.* So her supervisor at the bank wanted the police to get involved and check on her well-being. *Id.* And the message – "please let her know that she is ok" – conveyed a level of concern, at a very human level. *Id.*

That written dispatch included loads of indicia that trouble was afoot. It did not expressly mention suicide, but it didn't need to. The Fourth Amendment did not require the use of the "s-word." The dispatch gave plenty of reasons to think that the "distraught" and "depressed" employee – who left work early, needed "to go get evaluated," and couldn't be reached – was not in a good place.

Even if the officers knew what was in the written dispatch, and nothing else, qualified immunity would protect their decision to enter the home. Cardenas has the burden of showing

that entry into a home to check on a "distraught" and "depressed" person violated a clearly established right. Cardenas has not carried her burden.

At best, Cardenas attempts to distinguish *Fitzgerald* and *Sutterfield*. It's true that there are some differences between those cases and the case at hand. But to carry her burden, Cardenas would need to come forward with something on her side of the ledger, meaning case law that found a violation of a clearly established right in a comparable situation. And she hasn't. Her discussion of qualified immunity is only a few paragraphs long, and she offers no case law of her own. *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 12–13 (Dckt. No. 126).

Cardenas argues that there were "no grounds for a reasonable belief that 1) a person in need was physically at the location of 4819 N. McVicker Avenue, 2) a serious injury or threat of serious injury had taken place, or 3) an injury or danger was imminent." *Id.* at 12. Actually, the written dispatch laid the groundwork for all three. Bank of America gave the dispatcher her address, and home is a logical place to go when looking for someone. There was a reason to believe that the employee was unwell and needed help right away. That was the reason for the 911 call in the first place.

Taking a step back, it is important to remember that the events unfolded in real-time, and officers had to make quick decisions about the well-being of another person. The police on the spot – in the heat of the moment – did not have the luxury of sitting back and carefully parsing case law. There was no time to ponder how this case fits within the body of Fourth Amendment jurisprudence.

They had to make a decision about what to do when a young woman was a threat to herself. And they decided to act. That decision did not violate any clearly established right, so the officers are entitled to qualified immunity.

33

"Qualified immunity is supposed to protect officers in the close case, and it therefore must apply to the officer's snap judgment in a legally hazy area." *White v. Stanley*, 745 F.3d 237, 241 (7th Cir. 2014). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). "[D]efendants here enjoy qualified immunity 'if a reasonable officer could have believed' . . . that the officers' entry into [plaintiff's] home . . . was constitutional." *Wonsey v. City of Chicago*, 940 F.3d 394, 400 (7th Cir. 2019) (citation omitted).

The officers here had more-than-ample reason to believe that entering a home to check on a suicidal person was permissible. So Plaintiffs have no claim.[10]

\*    \*    \*

One final word. Justice Kavanaugh's concurring opinion in *Caniglia* demonstrates the necessity of giving officers some leeway when responding to emergency situations to protect the community. Justice Kavanaugh provided "[a] few (non-exhaustive) examples [that] illustrate"

---

[10] This Court does not need to reach whether the officers would have enjoyed qualified immunity under the community caretaking function, too. This Court will simply note that Illinois courts have recognized the ability of police to enter homes under that doctrine, and have done so before and after the events in the case at hand. Illinois courts have applied the community caretaking doctrine to justify warrantless entries into homes both before and after the officers' October 1, 2015 entry. *See, e.g.*, *People v. Hand*, 408 Ill. App. 3d 695, 349 Ill. Dec. 343, 946 N.E.2d 537, 545 (2011) (finding officers' warrantless entry into home reasonable under the community caretaking exception); *People v. Mikrut*, 371 Ill. App. 3d 1148, 309 Ill. Dec. 717, 864 N.E.2d 958, 962–63 (2007) (holding that police acted within their "community caretaking function" when they entered a home for the limited purpose of preventing domestic disturbance); *People v. Foresta*, 2021 IL App (2d) 190434-U, ¶ 28 (2021) (unpublished) (holding that officers' entry into home "clearly fell within the ambit of the community-caretaking doctrine" when officers "were aware of a report . . . that he might be suicidal"); *People v. Kolesnikov*, 2020 IL App (2d) 180787, 443 Ill. Dec. 889, 162 N.E.3d 1040, 1041, 1046 (2020) (holding that officers who responded to 911 call about a potentially suicidal subject were justified in entering the home under the community caretaking doctrine). In *Sutterfield*, the Seventh Circuit noted that a state court's application of the community caretaking doctrine to homes is relevant, even though the Seventh Circuit itself had not applied that doctrine to homes. *See Sutterfield*, 751 F.3d at 573 ("In the absence of a controlling decision by the United States Supreme Court, the Wisconsin cases are thus as relevant as our own precedents in evaluating what a Milwaukee police officer might have thought the law permitted in responding to a report that the occupant of a private dwelling was in danger of harming herself.").

some "heartland emergency-aid situations." *Caniglia*, 141 S. Ct. at 1604 (Kavanaugh, J., concurring); *see also Gaetjens*, 4 F.4th at 493 (citing the example of an emergency-aid situation from Justice Kavanaugh's *Caniglia* concurrence). One of his examples refers to a person who may be suicidal:

> Suppose that a woman calls a healthcare hotline or 911 and says that she is contemplating suicide, that she has firearms in her home, and that she might as well die. The operator alerts the police, and two officers respond by driving to the woman's home. They knock on the door but do not receive a response. May the officers enter the home? *Of course*. . . . The Fourth Amendment does not require officers to stand idly outside as the suicide takes place.

*Caniglia*, 141 S. Ct. at 1604 (Kavanaugh, J., concurring) (emphasis added).

Officers do not have to wait for catastrophe. They can try to prevent it. "The officers do not need to show that the harm has already occurred or is mere moments away, because knowing that will be difficult if not impossible in cases involving, for example, a person who is currently suicidal . . . . If someone is at risk of serious harm and it is reasonable for officers to intervene now, that is enough for the officers to enter." *Id.*

"[W]hen police are acting in a swiftly developing situation . . . a court must not indulge in unrealistic second-guessing." *Leaf*, 400 F.3d at 1092. This Court cannot second guess the officers' decision to enter the home to ensure Cardenas's safety.

Defendants are therefore entitled to qualified immunity on the warrantless entry claim. The Court grants the officers' motion for summary judgment on the illegal entry claim (Count I).

## II.     Unlawful Search (Counts I & II)

Plaintiffs also brought two claims about the search of their home. They divided that concept in two. Count I is about existence of the search (plus the entry into the home), and Count II is about the scope and duration of the search. Taken together, they argued that the search shouldn't have happened at all, and in any event, it was too broad and lasted too long.

The Court will first address the fact of the search (Count I), and then will address its scope and duration (Count II).

## A.    The Search Itself (Count I)

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).  The officers argue that once inside Plaintiffs' home, they were entitled to perform a protective sweep to guarantee their safety and the safety of any occupants.  They also argue that the search is protected by qualified immunity.  *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 8 (Dckt. No. 109).

The Court agrees.  If the police could enter the home to look for someone (to check on her well-being), then they could search for her once inside.  The search was the whole point of the entry.  The police could do a protective sweep, too.

"[A] protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others." *United States v. Starnes,* 741 F.3d 804, 807 (7th Cir. 2013). Upon entering a home, officers can "look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched" "as a precautionary matter and without probable cause or reasonable suspicion." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  "The search must be cursory, lasting no longer than is necessary to dispel the reasonable suspicion of danger.  It must also be limited to a cursory visual inspection of places where a person might be hiding." *Starnes*, 741 F.3d at 808 (citing *Buie*, 494 U.S. at 327, 335–36).

The officers must base the need for a protective sweep on "specific and articulable facts." *United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014).  That need is apparent in a case like this one, when there is a specific and articulable basis for a concern about self-harm or

suicide (*i.e.*, violent acts). In *Sutterfield*, the Seventh Circuit observed that the officers' entry into the home also justified a protective sweep. *See Sutterfield*, 751 F.3d at 566 ("Given our conclusion that the forced entry was reasonable, the sweep that resulted in the discovery of the locked compact disc case . . . was also reasonable . . . ."). The same holds true here.

Once inside the home, the officers were entitled to perform a cursory visual search for any person who might harm them or others, and search for Cardenas. After all, finding Cardenas was the reason for entering the home in the first place. And in any event, performing a search did not violate clearly established law, and thus receives protection under qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009) ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment.").

The Court grants Defendants' motion for summary judgment on the claim about the fact of the search (Count I). The Court now turns to the claim about the scope and the duration of the search (Count II).

### B.      The Scope and Duration of the Search (Count II)

There is a genuine issue of material fact about the scope and the duration of the search. So the Court denies the motion for summary judgment on Count II.

A protective sweep has limits, in space and time. It involves a "cursory visual inspection of places where a person might be hiding." *Starnes*, 741 F.3d at 808 (citation omitted). The search can "last[] no longer than is necessary to dispel the reasonable suspicion of danger." *Id.*; *see also Henderson*, 748 F.3d at 793 (holding that scope and duration of protective sweep were reasonable where a SWAT team conducted a "cursory" sweep that "lasted no longer than five minutes" and where "nothing was touched or moved").

Defendants offered evidence that they performed a limited search of the home to locate Cardenas. They don't specify the length of the search itself, but they offer evidence that they were in the home for only ten to fifteen minutes (total). *See* Defs.' Statement of Undisputed Facts, at ¶¶ 41, 46 (Dckt. No. 111). And according to the officers, they didn't make a mess. Nothing was out of place. *Id.* at ¶¶ 43–45.

But Gonzalez testified that the police were in his home for 35 to 45 minutes. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 125). Plaintiffs also offered evidence that the police left the house in disarray, and did so for no legitimate reason. Cardenas and Gonzalez testified that the officers rifled through their drawers, searching furniture and areas where Cardenas herself could not possibly be hidden. *Id.* at ¶¶ 41, 43–44; *see also* Pls.' Statement of Additional Facts, at ¶ 39 (Dckt. No. 123). Cardenas testified that the officers had "gone . . . into the drawers in her dresser, including the drawer in which she kept her underwear." *See* Pls.' Resp. to Defs.' Statement of Undisputed Facts, at ¶ 43.

Opening and searching through drawers and moving items around are outside the scope of a protective sweep for a person or an item in plain sight. *See Sutterfield*, 751 F.3d at 566 ("Opening the locked compact disc case was a significant step beyond the search authorized by *Buie*. The case was obviously too small to be hiding a person . . . ."); *see also id.* at 567–68 (noting that authorizing a full search of the premises after entry to address potential suicide, "including closed containers, for firearms" would be "license to conduct virtually a top-to-bottom search of the home, as almost any closet, drawer, or container theoretically could contain a handgun (or other potential implements of self-harm)"). Cardenas couldn't fit in the dresser drawers, so there was no reason to go through them.

38

Qualified immunity doesn't apply to this claim, either. It is clearly established that a search beyond the scope of a protective sweep is unconstitutional unless the officers have articulable facts to justify expanding the search. *See Sutterfield v. City of Milwaukee*, 870 F. Supp. 2d 633, 641 (E.D. Wis. 2012), *aff'd*, 751 F.3d 542 (7th Cir. 2014) (observing that during a protective sweep, when "dangerous materials" are not in "plain sight," officers "cannot go looking for them, inspecting all the contents of a home at their leisure").

In *Sutterfield*, the Seventh Circuit held that the officers were entitled to qualified immunity for their search of a "locked compact disc case" during their protective sweep of the home. *See Sutterfield*, 751 F.3d at 572. It could have contained a gun. Given the broad application of the community caretaking doctrine under Wisconsin state law, and given Sutterfield's "threat to harm herself and her physician's report that she likely possessed a gun, police had reason to look for any firearm that Sutterfield might use to harm herself." *Id.* at 577–78. But the Court of Appeals observed that a "more intrusive" search – meaning a search beyond a "limited, protective sweep" of "places within the home that another person might be found" – would require an additional justification. *Id.* at 577.

The police officers in this case present no similar facts to justify searching drawers in Cardenas's home. They were looking for a person, first and foremost, and that search did not require a search through small spaces. So the officers are not entitled to qualified immunity for the scope and duration of the search.

Viewing the evidence in the light most favorable to Plaintiffs, as the Court must do at this stage, there is a factual dispute about the scope and duration of the search. There is a jury question about whether the police spent too long in the home, and looked in too many places.

There is a factual dispute about whether the search was reasonable, so the claim needs to go to trial.

Defendants' motion for summary judgment on Count II is denied.

### III. Officer Bubalo

Defendants separately move to dismiss all claims against Officer Bubalo. They argue that Plaintiffs haven't presented evidence that Officer Bubalo entered or searched Plaintiffs' home. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 14–15 (Dckt. No. 109).

Officer Bubalo testified that he responded to the call for backup, but never entered the home. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 125). He said he pulled up outside the home, but by the time he arrived, the other officers were leaving the home. *Id.* at ¶¶ 25–26. So he stayed in his squad car. *Id.*

There is no direct evidence that Officer Bubalo entered the home. At deposition, Gonzalez did not testify that Officer Bubalo entered his home. *See* Gonzalez Dep. (Dckt. No. 124-11). His declaration does not say that Officer Bubalo entered his home, either. *See* Gonzalez Dec. (Dckt. No. 124-19). The omission is telling. The declaration does identify – by name – five specific officers who entered the home, but Gonzalez said no such thing about Officer Bubalo. Gonzalez viewed screen shots from the video depositions, too, but he could not identify Officer Bubalo as one of the officers who he saw in his home. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 125) (identifying five officers who entered his home, but not Officer Bubalo).

Plaintiffs respond that there is circumstantial evidence that Officer Bubalo entered the home because Gonzalez testified that "as many as ten officers entered his home." *See* Pls.' Resp. to Defs.' Mtn. for Summ. J., at 13 (Dckt. No. 126). But testimony about the number of officers

is not the same thing as evidence about the identities of those officers. The question is who, not how many. The number of officers cannot support an inference about who those officers were.

Plaintiffs point to the City's records that list Bubalo as one of the officers who responded to the call. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 4, 15 (Dckt. No. 133); 10/1/15 Event Query Report (Dckt. No. 124-7). In the "Unit Summary" portion of the report, Unit 1634 (which the parties confirm was Bubalo's beat number) is listed as dispatched. *Id.* (Dckt. No. 124-7, at 3 of 3). But nothing in that report indicates that Officer Bubalo entered the home. Information about an officer responding to a call does not reveal *how* the officer responded, or *where* he went.

The Court grants summary judgment to Officer Bubalo.

## IV. Judicial Estoppel

The claims by Gonzalez fail for an independent reason. Gonzalez has surrendered the privilege of bringing a claim at all.

Gonzalez, it turns out, filed for bankruptcy in 2017, and he had to list his assets as part of that bankruptcy filing. The bankruptcy petition required him to disclose – under penalty of perjury – any potential claims. A debtor must disclose potential claims because they have potential value, and any assets of the debtor belong to the estate and ultimately go to creditors.

But Gonzalez never mentioned a potential claim against the police officers when he filed for bankruptcy. That is, in his bankruptcy petition, he didn't say anything about the police entering and searching his home in 2015. He didn't mention emotional trauma, either. He kept it to himself. By keeping quiet, Gonzalez failed to disclose a potential asset. He did not tell the full story to the bankruptcy court.

After filing for bankruptcy, Gonzalez filed this lawsuit. During discovery, Defendants learned about the bankruptcy filing. They later moved for summary judgment based on judicial estoppel. But the record contained gaps. Plaintiffs' counsel instructed Gonzalez not to answer questions about his bankruptcy at deposition.

This Court wanted to get to the bottom of things, so it set an evidentiary hearing to gather the facts and hear the full story. This Court did so because the Seventh Circuit has encouraged evidentiary hearings in similar circumstances involving judicial estoppel. *See, e.g.*, *Matthews v. Potter*, 316 F. App'x 518, 523 (7th Cir. 2009) ("[T]he court must make a factual determination, by evidentiary hearing if necessary, regarding the nature and extent of the disclosures Matthews made to the Chapter 7 trustee at the meeting of creditors."); *Pruitt v. Quality Labor Servs., LLC*, 2018 WL 5808461, at *2 (N.D. Ill. 2018) (holding an evidentiary hearing and then deciding whether defendant "prove[d] by a preponderance of the evidence that the plaintiff-debtor intentionally concealed the claim").

Plaintiffs' counsel fought the hearing tooth and nail, filing motion after motion, resisting every step of the way. The eruption of objections was nothing short of vesuvian. But the evidentiary hearing went forward.

In the end, after hearing the testimony and reviewing the full record, one conclusion is inescapable. Gonzalez failed to disclose a potential claim about what happened at his home, and the failure to disclose was not an oversight. Gonzalez knew that he had a potential claim, and he knew that it had value. The Court finds that Gonzalez intentionally misrepresented his financial situation to the bankruptcy court by falsely stating that he had no potential claims.

42

As a result, Gonzalez has lost the privilege of bringing his claims here and now. After representing to the bankruptcy court that he had no potential claims of any value, Gonzalez cannot change his tune and tell a jury that he has a claim of value.

## A.    The Backstory

### 1.    The Bankruptcy Petition

This case involves an entry into Gonzalez's home on October 1, 2015. About 15 months later, on January 12, 2017, Gonzalez filed a chapter 7 bankruptcy petition. *See In re Juan Gonzalez*, No. 17-bk-00895 (Bankr. N.D. Ill.). When identifying his assets in his bankruptcy petition, he didn't mention anything about a potential claim against the police.

Bankruptcy petitions require debtors to disclose their assets, because the filing of a bankruptcy petition means that the assets become the property of the estate. *See* 11 U.S.C. § 541(a) (providing that an estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"); 1 Robert E. Ginsberg & Robert D. Martin, *Ginsberg & Martin on Bankruptcy* § 5.01 (Hon. Catherine J. Furay ed., 5th ed. Supp. 2021) ("The filing of a voluntary petition . . . in a Chapter 7, 11, 12, or 13 case immediately creates a bankruptcy estate. . . . The estate generally consists of property and interests in property that the debtor had at the moment of the filing of the debtor's bankruptcy petition."); 5 *Collier on Bankruptcy* § 541.01 (Richard Levin & Harry J. Sommer eds., 16th ed. 2021) ("Congress's intent to define property of the estate in the broadest possible sense is evident from the language of the statute . . . . It would be hard to imagine language that would be more encompassing."); *In re Carousel Int'l Corp.*, 89 F.3d 359, 362 (7th Cir. 1996) ("[Section] 541 defines 'property of the estate' broadly, to include 'all legal or equitable interests of the debtor in property as of the

commencement of the case.'  Indeed, we have held that 'every conceivable interest of the debtor,

future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541.'")

(citations omitted).

One type of asset that flows to the estate is a right to bring a claim.  "The debtor's right to

sue for any reason is a property interest that almost inevitably becomes property of the estate. . . .

The trustee may recover in contract or in tort for injuries to both the debtor's person and

property, because these rights of action become estate property."  *See* 1 Robert E. Ginsberg &

Robert D. Martin, *Ginsberg & Martin on Bankruptcy* § 5.01 (Hon. Catherine J. Furay ed., 5th ed.

Supp. 2021); 5 *Collier on Bankruptcy* § 541.07 (Richard Levin & Harry J. Sommer eds., 16th ed.

2021) ("The estate created pursuant to section 541(a) includes causes of action belonging to the

debtor at the time the case is commenced. . . .  For instance, upon filing a bankruptcy petition,

the debtor's entire interest in a prepetition personal injury claim becomes property of the estate

and may not be pursued by the debtor."); *Juza v. Wells Fargo Bank, N.A.*, 794 F. App'x 529, 535

(7th Cir. 2020) ("A legal claim is an asset that must be disclosed during bankruptcy so that it can

be administered along with a debtor's other assets."); *Cannon-Stokes v. Potter*, 453 F.3d 446,

448 (7th Cir. 2006) ("[A]s a technical matter the estate in bankruptcy, not the debtor, owns all

pre-bankruptcy claims . . . .").

Debtors must disclose all of their assets in bankruptcy schedules.  Here, Gonzalez's

bankruptcy petition included "Schedule A/B:  Property."  *See* Chapter 7 Petition, at 10 of 54

(Dckt. No. 172).  He submitted the schedule as part of his original bankruptcy petition on

January 12, 2017.  *Id.*; *see also* Chapter 7 Petition, at 10 of 54, *in In re Juan Gonzalez*, 17-bk-

00895 (Bankr. N.D. Ill.) (Dckt. No. 1 in the bankruptcy docket).  He filed an amended Schedule

A/B on January 18, 2017, and amended it again on March 22, 2017. *See In re Juan Gonzalez*, 17-bk-00895 (Bankr. N.D. Ill.) (Dckt. Nos. 10 & 17 in the bankruptcy docket).

That schedule required Gonzalez to disclose all of his assets. It began with a simple instruction: "Be as complete and accurate as possible." *See* Chapter 7 Petition, at 10 of 54 (Dckt. No. 172).

Part 4 of that schedule required Gonzalez to "Describe Your Financial Assets." *Id.* at 12 of 54. It began by asking a simple question: "Do you own or have any legal or equitable interest in any of the following?" *Id.* The schedule then asked questions about specific types of assets, such as cash, stock, retirement accounts, annuities, patents, licenses, money owed, and so on. *Id.* The list covered the waterfront, and conveyed the unmistakable message that a debtor must disclose anything and everything of value.

One questions asked about potential claims. Question 33 required Gonzalez to disclose if he had any "[c]laims against third parties, whether or not you have filed a lawsuit or made a demand for payment." *Id.* at 14 of 54. The form gave examples, too: "*Examples:* Accidents, employment disputes, insurance claims, or rights to sue." *Id.* (emphasis in original).

Gonzalez checked a box, and gave a simple answer: "No." *Id.* By giving that answer, Gonzalez represented to the bankruptcy court that he had no claims or *potential* claims. The question made clear that it applied "*whether or not you have filed a lawsuit.*" *Id.* (emphasis added). It covered rights "to sue." *Id.*

The very next question covered the point again, making sure that the debtor disclosed anything and everything. The form asked about any "[o]ther contingent and unliquidated claims of every nature." *Id.* Once again, Gonzalez responded "No." *Id.*

Another question asked about "[o]ther amounts someone owes you." *Id.* Examples included unpaid wages, disability payments, sick pay, vacation pay, unpaid loans, and so on. *Id.* Once again, Gonzalez answered "No." *Id.*

To remove any doubt, the section of the schedule included a catch-all provision. *Id.* The form asked Gonzalez if he had "[a]ny financial assets you did not already list." *Id.* Once again, he answered "No." *Id.*

Gonzalez signed the petition under penalty of perjury, and represented that it contained truthful information. "I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct." *Id.* at 6 of 54. His signature appeared right below a warning about providing false information: "I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both." *Id.*; *see also* Chapter 7 Petition (Dckt. No. 172-1, at 1 of 7) (the handwritten signature).

Gonzalez knew that his bankruptcy petition needed to be truthful, accurate, and complete. *See* 3/3/21 Tr., at 95:24 – 96:1 (Dckt. No. 201). He also knew that he needed to disclose all of his assets. *Id.* at 96:2-4.

Gonzalez did not go solo when he filed the petition. He had the assistance of counsel, an attorney from Illinois Advocates (a firm that handles legal issues for union members). *See* Chapter 7 Petition, at 47–50 of 54 (Dckt. No. 172); *see also* Gonzalez Dep., at 128:22 – 129:10 (Dckt. No. 124-11); 3/3/21 Tr., at 69:24 – 70:1 (Dckt. No. 201). The attorney signed the petition on the following page. *See* Chapter 7 Petition, at 7 of 54.

The bankruptcy proceeding didn't last long. Gonzalez met with the bankruptcy trustee in March 2017. His debts were discharged in April 2017. The bankruptcy case closed on April 20,

46

2017.  *See generally In re Juan Gonzalez*, 17-bk-00895 (Bankr. N.D. Ill.); *see also* Statement of

Juan Gonzalez, at ¶ 3 (Dckt. No. 153).

### 2. The Deposition

Gonzalez filed this lawsuit in September 2017.  That is, he filed suit eight months after

filing for bankruptcy (in January 2017), and almost two years after the police entered his home

(in October 2015).  *See* Cplt. (Dckt. No. 1).

During discovery, defense counsel learned that Gonzalez had filed for bankruptcy.  *See*

3/3/21 Tr., at 74:24 – 75:20 (Dckt. No. 201).  So defense counsel asked Gonzalez about it at his

deposition.

Plaintiffs' counsel wouldn't let her client answer.  "I'm going to object and not allow him

to answer any more questions about his bankruptcy."  *See* Gonzalez Dep., at 113:21-22 (Dckt.

No. 124-11).  Plaintiffs' counsel added that she was "going to be seeking a protective order from

the Court, and so I'm allowed under the federal rules to instruct him not to answer any

questions."  *Id.* at 115:6-8.  When asked, counsel for Gonzalez would not give the basis for

seeking a protective order:  "I don't have to answer those questions."[11]  *Id.* at 115:11-12.

Gonzalez's counsel then instructed her client not to answer a series of questions about his

bankruptcy filing.  *Id.* at 113:21 – 121:7.  The unanswered questions included whether Gonzalez

had ever spoken to his bankruptcy attorney about his assets, and whether his bankruptcy

schedules disclosed his claim against the police.  *Id.* at 118:2 – 119:8.  Counsel would not let

Gonzalez testify about why he failed to disclose his claim in his bankruptcy schedule:

---

[11]  In a later filing, Plaintiffs' counsel asserted that any questions about Gonzalez's non-disclosure "may
be subject to plaintiff's privilege against self-incrimination."  *See* Pls.' Resp., at ¶ 9 (Dckt. No. 74).

Before the evidentiary hearing in 2021, Plaintiffs' counsel called the questioning by defense counsel
"aggressive."  *See* Statement of Plaintiffs' Attorney, at ¶ 9 (Dckt. No. 154).  It was not aggressive.

Q:    Why did you not list this lawsuit or potential lawsuit on your
      schedules that you filed in your bankruptcy case?

Plaintiffs' Counsel:  Instruct Mr. Gonzalez not to answer the question for
the same reasons that we have already stated.

Q:    Are you taking your attorney's advice?

A:    Yes.

                        *        *        *

Q:    As you sit here today, what is the value that you place on this
      lawsuit? How much do you think the lawsuit's worth?

Plaintiffs' Counsel:  Objection; instructing him not to answer the question.

Q:    On what basis?

Plaintiffs' Counsel:  Same objections.

Q:    Are you taking your attorney's advice?

A:    Yes.

*Id.* at 120:10 – 121:7; *but see Redwood v. Dobson*, 476 F.3d 462, 467–68 (7th Cir. 2007)

("Counsel for the witness may halt the deposition and apply for a protective order, see Rule

30(d)(4), but must not instruct the witness to remain silent.").

        Other parts of the deposition did shed some light.  Gonzalez testified that he called the

Independent Police Review Authority ("IPRA") – an agency that investigates police misconduct

– on the same day that the police searched his home.  *See* Gonzalez Dep., at 74:2 – 76:11 (Dckt.

No. 124-11).  He called to "complain about the police officer's behavior."  *Id.* at 74:14-15.  He

testified:

Q:    Sure.  But fair to say that the day of the incident you called IPRA;
      right?

A:    Yes.

48

> Q:    And so you thought that something – you had been wronged the
>       day of the incident; right?
>
> A:    Yes.

*Id.* at 105:10-15.  In fact, Gonzalez wasn't sure who he called first – the IPRA, or his

stepdaughter Stephanie Cardenas (even though the police were checking on her well-being).  *Id.*

at 74:5-6.

Gonzalez also testified about contacting an attorney.  He reached out to lawyers about the

conduct of the police within months of the incident in October 2015.  He testified:

> Q:    Okay.  So just to get back to my original question, when was the
>       first time that you contacted an attorney regarding this lawsuit?
>
> A:    Sometime after, but I don't know the time frame.
>
> Q:    Okay.  Was it a year after?
>
> A:    No.  *Months*.
>
> Q:    It was – it was less than a year after?
>
> A:    Yes.

*Id.* at 106:18 – 107:2 (emphasis added).

Specifically, Gonzalez explained that he had reached out to Illinois Advocates, the same

firm that eventually handled his bankruptcy filing in January 2017.  *Id.* at 107:13 – 108:22,

113:6-14.  But they declined to pursue the claim against the police.

So Gonzalez searched for new attorneys, and reached out to Irene Dymkar, his current

counsel.  *Id.* at 107:13 – 108:22; *see also* Statement of Juan Gonzalez, at ¶ 5 (Dckt. No. 168) ("I

had a complaint about how the police treated me and I discussed it with Illinois Advocates, a

firm that also represented me in the bankruptcy.  They decided not to proceed with a case.  I

contacted other attorneys, including Ms. Dymkar, and she was willing to investigate the matter.").

### 3.    The Amended Bankruptcy Petition

After the deposition in June 2018, Gonzalez's counsel did not file a motion for a protective order. Instead, the City filed a motion to compel, asking for an order requiring Gonzalez to sit for deposition a second time and testify about his bankruptcy. *See* 6/21/18 Mtn. (Dckt. No. 68).

While that motion was pending, Gonzalez went back to bankruptcy court. On July 17, 2018, Gonzalez filed a motion in bankruptcy court to reopen his bankruptcy. *See* 3/3/21 Tr., at 79:22 – 80:22 (Dckt. No. 201); *In re Juan Gonzalez*, 17-bk-00895 (Bankr. N.D. Ill.) (Dckt. No. 22 in the bankruptcy docket).

Two months after the deposition, on August 22, 2018, Gonzalez filed an amended bankruptcy petition. For the first time, he disclosed the existence of this litigation against the police officers.

He disclosed the lawsuit in response to Question No. 30, which asked about "[o]ther amounts someone owes you." He checked the box "Yes," and added the following:

> Unknown unliquidated contingent claim, approximately $0-$45,000 – Debtor's interest is 50% of settlement, minus attorneys' fees, set at 40% of the total settlement amount, and reimbursement for costs.

> Federal Case No. 17 C 7080, filed 09/29/17.

*See* Am. Bankruptcy Petition (Dckt. No. 157-2).[12] Gonzalez later explained that Plaintiffs' counsel selected that number. *See* 3/3/21 Tr., at 106:9 – 108:17 (Dckt. No. 201).

---

[12] Gonzalez is entitled to only "50%" of the recovery because of his divorce. The claim was a marital asset, and his wife was entitled to the other 50%. *See* 3/3/21 Tr., at 77:2-21 (Dckt. No. 201); Gonzalez Dep., at 112:16 – 113:18 (Dckt. No. 124-11). The fact that the claim was a marital asset underscores that it had value, and that Gonzalez should have disclosed it in his bankruptcy petition on day one.

Notice that Gonzalez assigned a specific monetary value to his claim against the police officers. The exact amount was "[u]nknown," but Gonzalez estimated that his claim was worth up to $45,000. *Id.* So, Gonzalez admitted that his claim had a potential value of tens of thousands of dollars.

A few weeks later, Judge Castillo (this Court's predecessor, before reassignment) presided over a hearing and denied the motion to compel without prejudice. *See* 10/2/18 Order (Dckt. No. 93). Judge Castillo concluded that the issue was moot in light of the filing of the amended bankruptcy petition. *See* 10/2/18 Tr., at 4:5-9 (Dckt. No. 114) ("My knowledge, which is not extensive of bankruptcy law, is he had to file a pretty extensive schedule which would justify why he went into bankruptcy. So my question to the defendants is isn't that moot at this point?").

Defense counsel responded: "the issue was that he did not include this case as part of the assets originally is my understanding, and now that we have been informed that he has, I don't think we would need to pursue any further at this time." *Id.* at 4:10-14.

Counsel's response missed the boat. The issue was the integrity of a judicial proceeding. A false statement to a court isn't necessarily cured by giving a truthful statement after the fact, especially when someone else flags the falsity of the statement. There are institutional interests at stake, above and beyond the need for an accurate bankruptcy proceeding. But Judge Castillo followed defense counsel's lead, and denied the motion as moot. *Id.* at 4:15-17.

### 4. The Testimony before the Bankruptcy Trustee

On January 4, 2019, Gonzalez testified under oath before the bankruptcy trustee about his failure to disclose the incident involving the police. *See* 1/4/19 Bankr. Tr. (Dckt. No. 180); *see*

*also* 3/3/21 Tr., at 80:24 – 81:1 (Dckt. No. 201); Statement of Juan Gonzalez, at ¶¶ 5–6 (Dckt. No. 153).

In the hearing with the trustee, Gonzalez's counsel acknowledged that he should have disclosed the incident involving the police in his original bankruptcy petition. The failure to do so was merely an "oversight":

| | |
|---|---|
| Trustee: | And why don't you for the record, just give us the circumstances regarding a motion to reopen, briefly? |
| Counsel: | Yes. We filed a motion to reopen because it came to my attention that a civil rights case had been filed where the circumstances for the case actually preceded the filing of the bankruptcy. And so – |
| Trustee: | So you're saying the civil rights action was property in the bankruptcy of state [sic] and should have been listed on the schedule but was not? |
| Counsel: | That is correct. Yes. |
| Trustee: | Okay. And do you know why that occurred, or? |
| Counsel: | To my understanding, I believe it was just an oversight on Mr. Gonzalez's part. I don't believe that he realized that a civil rights proceeding fell under the terms of a lawsuit, perhaps. I can't speak for Mr. Gonzalez on that. But I believe that would [be] what happened. |

*See* 1/4/19 Bankr. Tr., at 00:57 to 01:59 (Dckt. No. 180).

The trustee then posed a series of questions to Gonzalez, who testified under oath. Gonzalez confirmed that the incident happened in 2015, long before he filed for bankruptcy in 2017. *Id.* at 01:59 to 02:36. He also admitted that he contacted Illinois Advocates "soon after." *Id.* at 02:24. "They took the case in the beginning, and then they dropped it, and then I had to seek another attorney office." *Id.* at 02:48-55; *id.* at 3:25-46 ("[T]he incident happened, then I saw the Illinois Advocates' attorney, and then it got dropped. Then I went to look for another

attorney who started to look into it, and then it got filed after the bankruptcy got discharged in 2017. It got filed after that.").[13]

Gonzalez explained how he searched for other attorneys after Illinois Advocates declined to take the case. "I was just looking online, talking to people, and then I found someone." *Id.* at 05:48-53. It "was just a bunch of telephone calls." *Id.* at 05:56-59.

The trustee then examined Gonzalez about the incident with the police, presumably to figure out if it was worth pursuing. *Id.* at 06:05 – 10:10. The trustee elicited admissions about the case. First, the police did not break down his door. *Id.* at 07:09-23. Second, the police did not make any physical contact with Gonzalez. *Id.* at 07:52 – 08:37. Third, the police did not physically restrain him – they simply told him to stand there. *Id.* at 08:37 – 09:13. And fourth, the police did not destroy any property. *Id.* at 09:37-57.

The trustee ended by asking Gonzalez if there was anything else that he wanted to tell the trustee. Gonzalez said no. *Id.* at 09:59 – 10:10.

Gonzalez made three omissions. First, in his deposition, Gonzalez testified that a police officer pointed a gun at his face for between 5 and 15 seconds. *See* Gonzalez Dep., at 42:23 – 45:15 (Dckt. No. 124-11). Gonzalez made the same point in the evidentiary hearing before this Court in 2021. *See* 3/3/21 Tr., at 54:1-10 (Dckt. No. 201) (testifying that officers, plural, pointed a gun at him). In the hearing with the trustee, Gonzalez testified that guns were drawn, but he

---

[13] Gonzalez told Illinois Advocates about the incident with the police shortly after it happened. And later, Illinois Advocates filed a bankruptcy petition on his behalf. So the firm that handled his bankruptcy is the same firm that heard about the incident on the day that it happened. *See* 3/3/21 Tr., at 72:14-19 (Dckt. No. 201); 1/4/19 Bankr. Tr., at 02:48-55, 03:25-46 (Dckt. No. 180). Illinois Advocates knew about the incident, but then filed a bankruptcy petition that failed to disclose the incident. (The firm was the same, but the attorneys were different. *See* 3/3/21 Tr., at 42:8-13, 75:15-18, 93:5-14, 101:7-13, 103:1-15.)

never mentioned that more than one officer pointed a gun at him. *Id.* at 50:10 – 59:4; *see also see* 1/4/19 Bankr. Tr. (Dckt. No. 180).

Second, Gonzalez didn't mention anything about being afraid, or disclose any emotional trauma. *See* 1/4/19 Bankr. Tr. (Dckt. No. 180); *see also* 3/3/21 Tr., at 62:9 – 64:1 (Dckt. No. 201).

Third, Gonzalez did not tell the bankruptcy trustee about a settlement conference that he apparently had with Judge Castillo in April 2018, meaning nine months earlier. (This Court first learned about it when Gonzalez filed a declaration before the evidentiary hearing in March 2021, and summarized what Judge Castillo said during that settlement conference.) On April 18, 2018, Gonzalez "heard Judge Ruben Castillo give his opinion to the parties that the lawsuit was worth $0 – $80,000." *See* Statement of Juan Gonzalez, at ¶ 8 (Dckt. No. 168).[14]

So, according to Gonzalez, Judge Castillo told him that his case might be worth $80,000. But Gonzalez did not mention that fact during his hearing with the bankruptcy trustee, when the trustee was evaluating whether the claim had any value.

The trustee later decided not to pursue the claim. *See* 3/3/21 Tr., at 81:20 – 82:14 (Dckt. No. 201). The bankruptcy estate closed for the second time on March 4, 2019. *See In re Juan Gonzalez*, 17-bk-00895 (Bankr. N.D. Ill.); Statement of Juan Gonzalez, at ¶ 7 (Dckt. No. 153).

---

[14] Plaintiffs' counsel objected at the evidentiary hearing when defense counsel asked about comments by Judge Castillo at the settlement conference. *See* 3/3/21 Tr., at 46:15 – 47:23 (Dckt. No. 201). But Gonzalez himself put it at issue. Gonzalez submitted a declaration – the day before the evidentiary hearing – that summarized what happened at the settlement conference with Judge Castillo, including Judge Castillo's estimate of the value of the case. *See* Statement of Juan Gonzalez, at ¶ 8 (Dckt. No. 168). So Plaintiff summarized the settlement conference in his declaration on March 2, 2021, and then objected when defense counsel asked about it on March 3, 2021.

### 5. The Filings Before the Evidentiary Hearing

But the issue did not go away. The City later filed for summary judgment, and raised the issue of judicial estoppel. The City argued that Gonzalez had failed to disclose the potential claims against the police officers in his original bankruptcy petition. According to the City, the failure to tell the full story and give a truthful statement in his bankruptcy petition means that he cannot bring a claim against the officers.

This Court noticed the holes in the evidentiary record, in light of the (improper) instructions not to answer by Plaintiffs' counsel at his deposition. Important questions went unanswered. So this Court *sua sponte* ordered an evidentiary hearing. *See* 2/11/21 Order (Dckt. No. 147); 2/11/21 Tr. (Dckt. No. 156). The Court ordered Gonzalez to testify under oath.

Plaintiffs' counsel responded by unleashing what can only be described as a torrential downpour – or perhaps artillery barrage – of objections. Plaintiffs filed motion after motion, attempting to derail this Court's plan to hear the story from Gonzalez himself. Objection after objection rained down on this Court.

Plaintiffs' counsel filed a motion for reconsideration, asking this Court to rethink the need for an evidentiary hearing. *See* Mtn. (Dckt. No. 149). Plaintiffs' counsel also filed a second motion with a large collection of objections to the hearing. *See* Mtn. (Dckt. No. 148). Plaintiffs' counsel then filed a third motion, arguing that there was no need for a hearing because this Court should deny Defendants' motion for summary judgment. *See* Mtn. (Dckt. No. 150). Plaintiffs' counsel then added to the pile, filing a fourth motion to vacate the Order setting the hearing. *See* Mtn. (Dckt. No. 152).

After filing four motions objecting to the hearing, Plaintiffs' counsel filed a statement, reiterating for good measure that counsel objected to the hearing. *See* Statement of Pls.'

Attorney (Dckt. No. 154). And then, Plaintiffs' counsel filed another statement, reminding this Court that Plaintiffs "continue to strongly object to the hearing for all the reasons set forth in their motions. Docs. 148, 149, 150, 152." *See* Statement Regarding Witnesses and Evidence for Hearing of March 3, 2021, at ¶ 3 (Dckt. No. 158). (This Court had figured that out already.)

 The evidentiary hearing took place.

 Before the hearing, this Court explained the reasons for the hearing in a series of written Orders. *See* 2/11/21 Order (Dckt. No. 147); 3/1/21 Order (Dckt. No. 162); 3/1/21 Order (Dckt. No. 163); 3/1/21 Order (Dckt. No. 164); 3/1/21 Order (Dckt. No. 165); 3/1/21 Order (Dckt. No. 166). For example: "The Court wants to hear an explanation, from Plaintiff Gonzalez directly, about why he did not list the claim as an asset when he filed for bankruptcy. The record on that issue is incomplete because Plaintiffs' counsel instructed him not to answer those questions at deposition, in violation of the Federal Rules." *See* 3/1/21 Order (Dckt. No. 162).

 A few weeks before the hearing, this Court ordered Gonzalez to disclose the amount of damages that he is seeking in this litigation. *See* 2/11/21 Order (Dckt. No. 147). The amount of damages sheds light on whether Gonzalez failed to disclose the potential claim intentionally.

 Damages must stem from an injury. The greater the damages, the greater the injury. And the greater the injury, the less likely that a plaintiff simply forgot to mention it. Forgetting to tell the bankruptcy trustee about a claim that is worth $10 is understandable. Overlooking a claim that is worth $50,000 or more is less likely.

 So this Court ordered Gonzalez to pin it down, and peg his claim to a number. *Id.* That directive was not particularly burdensome. The Federal Rules require plaintiffs to give a "computation of each category of damages claimed by the disclosing party" as part of initial disclosures, at the outset of the case. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii). Every defense counsel

worth his or her salt serves written discovery about damages, too. *See* 3/1/21 Order (Dckt. No. 164) ("Discovery about the amount of damages that a plaintiff is seeking is a bread-and-butter part of litigation.").

And here, the question was especially easy. Gonzalez estimated in his amended bankruptcy petition that the claim was worth "$0-$45,000." *See* Am. Bankruptcy Petition (Dckt. No. 157-2). That disclosure took place on August 22, 2018, two and a half years before the evidentiary hearing.

So, this Court was curious to know if Gonzalez's estimate of the value of the claim had changed in the intervening years. If Gonzalez sought pie-in-the-sky damages – after telling the bankruptcy trustee that the claim was worth $0-$45,000 – it might support an inference that Gonzalez had low-balled the trustee. It might show intent to deceive.

Gonzalez refused. Plaintiffs' counsel took the position that it would be impossible to put a number on the amount of damages: "So I'm not sure it's possible to do what you're asking us to do, Your Honor." *See* 2/11/21 Tr., at 20:24-25 (Dckt. No. 156); *id.* at 22:11-12 ("Yeah, I – I don't know if that's possible, Your Honor.").

In fact, Plaintiffs' counsel represented that she would never tell clients what they could expect in damages. "I *never tell clients*, you know, you could expect X amount of dollars here or Y amount of dollars, because that – I think that's irresponsible for an attorney." *Id.* at 20:21-23 (emphasis added).

Plaintiffs' counsel filed a motion for reconsideration, taking the view that Gonzalez had no duty to quantify his damages for emotional distress. *See* Mtn. (Dckt. No. 149). Gonzalez took the position that the obligation to disclose a "computation" of damages does not apply to damages for emotional distress. *Id.* at 2–3. (As an aside, the plain language of Rule 26 includes

no such carve-out. Instead of carving exceptions, it embraces everything, covering "*each* category of damages." *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added). And in any event, this Court can order a party to disclose something, even if it is not strictly required by Rule 26(a).)

According to Plaintiffs' counsel, experienced attorneys "would not and could not" give an exact figure for damages: "Even attorneys, such as plaintiffs' attorney, who have been practicing law for a number of years, would not and could not give an exact figure for emotional damages or punitive damages." *See* Mtn., at 4 (Dckt. No. 149).

But the filing acknowledged that the number could be big. "Plaintiffs' counsel are aware of verdicts in cases involving only emotional damages that have been in the millions of dollars." *Id.* So Gonzalez wanted to throw the claim to the jury, and see what happens, without answering this Court's questions about the value of his claim. *Id.* ("[P]laintiff does not have such a figure in mind, but rather wants to tell the jury what happened to him, and leave it to the jury to determine compensation, both compensatory and punitive.").

Plaintiffs' counsel added that Gonzalez did not know that he had a potential claim when he met with the bankruptcy trustee in 2017. "At the point when plaintiff Juan Gonzalez had his first meeting with the trustee in bankruptcy in early 2017, there was no lawsuit. He had not even been told by counsel that he had a viable claim." *Id.*; *see also id.* ("Mr. Gonzalez would not been [sic] able to put a figure on an asset that he did not even know was an asset.").

Pinning down the amount of damages that he is seeking is "something he cannot do." *Id.* at 3 (bold omitted). The "honest answer" was that Gonzalez "does not know the value of the lawsuit." *Id.* at 4. In a later filing, Gonzalez submitted a declaration, repeating that he was "not

able to give an exact figure on what my emotional damages are worth." *See* Statement of Juan Gonzalez, at ¶ 9 (Dckt. No. 153).

This Court denied the motion for reconsideration, and issued an Order explaining its reasons. *See* 3/1/21 Order (Dckt. No. 164). For the second time, this Court ordered Gonzalez to file a statement and disclose the amount of damages that he is seeking in this litigation. *Id.*

For the second time, Gonzalez refused. Instead of complying and giving a number, Plaintiffs' counsel filed a supplemental declaration from Gonzalez. *See* Statement of Juan Gonzalez (Dckt. No. 168). Gonzalez professed an inability to quantify the value of his claim.

"I do not mean at all to be disrespectful to the Court, but the Court is asking me to do something I am not able to do." *Id.* at ¶ 9. "I am not able to give an exact figure on what my emotional damages are worth." *Id.* He simply wanted to get to a jury: "I want to tell the jury what happened to me and have the jury determine what kind and what amount of damages to award me." *Id.*

So, even though he told the bankruptcy court what his claim was worth in 2018 (*i.e.*, $0 to $45,000), Gonzalez refused to tell this Court what his claim was worth.

### 6. The Evidentiary Hearing

The next day, this Court presided over an evidentiary hearing. *See* 3/3/21 Tr. (Dckt. No. 201); 3/3/21 Order (Dckt. No. 171). The Court began by reiterating the reasons for the hearing. *See* 3/3/21 Tr., at 6:10 – 8:5; *see also id.* at 7:12-15 ("There are gaps in the record about why plaintiff Gonzalez did not disclose the potential claim in his bankruptcy petition. So the purpose of today's hearing is to fill in those gaps and complete the record."). More objections followed. *Id.* at 20:21 – 21:7.

Before Gonzalez testified, this Court pinned down the chronology. Shortly before the hearing, this Court issued a minute order that summarized the key dates, with citations. *See* 3/3/21 Order (Dckt. No. 170) ("To speed things along and avoid confusion, counsel should be prepared to stipulate to the basic chronology (and offer any additions or corrections) at the outset of today's hearing. As the Court understands it, the events unfolded as follows.").

For example, the search by the police took place on October 1, 2015. *Id.* Gonzalez filed for bankruptcy on January 12, 2017. *Id.* Gonzalez filed this federal lawsuit on September 29, 2017. *Id.* And so on. At the beginning of the hearing, counsel stipulated to the chronology, with immaterial clarifications. *See* 3/3/21 Tr., at 8:7 – 14:6 (Dckt. No. 201). So, for any interested reader, that minute order provides a useful guidepost for the chronology. *See* 3/3/21 Order (Dckt. No. 170).

During his testimony, Gonzalez cemented a few points, and filled in some gaps. The hearing began with Gonzalez describing the events on the day of the search by the police officers. *See* 3/3/21 Tr., at 23:13 – 25:14 (Dckt. No. 201).

Gonzalez testified about the impact that the incident had on him, including his emotional state. For a period of time afterwards, he didn't feel safe in his own home. *Id.* at 59:23-25. And to this day, he "fear[s] the police." *Id.* at 60:7. "I do have a fear, a phobia, right now that I'm scared to be anywhere near the vicinity of them." *Id.* at 60:9-10. He had trouble sleeping, too. *Id.* at 60:15-17.

Gonzalez testified about how he responded after the police left his home. That very day, meaning the day of the entry and search, he called the Independent Police Review Authority and made a complaint. *Id.* at 26:22-25; *id.* at 93:7 ("I called IPRA the same day.").

60

Not long after, Gonzalez started contacting lawyers. Gonzalez reached out to Illinois Advocates – the law firm that eventually handled his bankruptcy filing – and told them what had happened. *Id.* at 27:1-16. He had a "[c]onsultation about the matter of my rights in this matter." *Id.* at 27:4.

That consultation with Illinois Advocates took place in 2015. *Id.* at 27:8-10. He later clarified that "Illinois Advocates was informed a couple days later," meaning a few days after the incident. *Id.* at 93:7-8; *see also id.* at 101:22 – 102:24 (confirming that he contacted Illinois Advocates "days," not "months," after the incident).

Gonzalez testified that Illinois Advocates "did a certain amount of looking into the case," and obtained records. *Id.* at 72:2 – 73:6. But Illinois Advocates then told Gonzalez "that they were not going to proceed with the claim." *Id.* Illinois Advocates "heard me out, and then they dropped the case." *Id.* at 29:23-24.

At that point, Gonzalez searched for more lawyers. Gonzalez explained that he was looking for counsel about his "legal matter":

> Q: Okay. After you contacted Illinois Advocates, did you look for another attorney to potentially file a lawsuit on your behalf?
>
> A: I was looking into consultation of my matter, my legal matter.

*Id.* at 27:17-21. He wanted to talk with a lawyer about his "rights under this incident that happened at October of 2015." *Id.* at 28:3-4.

Gonzalez cast a wide net when searching for counsel. He made "several phone calls" and reached out to "several attorneys" about the incident. *Id.* at 28:13-17. And that's when he landed on Irene Dymkar. "I made several phone calls, and I didn't keep a record. But there were several attorneys that I contacted before landing on Mrs. Dymkar." *Id.* at 28:15-17; *id.* at 70:10-17.

61

Later, in response to this Court's follow-up questions, Gonzalez testified that he may

have contacted up to *twenty lawyers*:

| | |
|---|---|
| The Court: | I understood you to say at the outset that after the incident with the Chicago Police Department, you contacted several attorneys and you made several phone calls. At least that's what I got in my notes. That's what I heard you to say. |
| | Do I have that right? |
| A: | First it was Illinois Advocates. They took a consultation, dropped the case. |
| | Then I made several phone calls. I didn't get – I didn't catch any attorneys [who] wanted to take the case. Then I found Ms. Dymkar. |
| The Court: | Okay. Thank you. |
| | Before filing for bankruptcy, how many lawyers did you reach out to about the incident with the Chicago Police Department? |
| A: | I – I couldn't answer that. I don't know. |
| The Court: | I mean, is it two or three or four or five? |
| A: | I don't have an amount. I don't have a log. |
| The Court: | Right. |
| | What's your best estimate is what I'm asking you. What's your best recollection? |
| A: | I would say *under 20*. |
| The Court: | Do you think it's more than ten? |
| A: | My best answer would be *under 20*. I – I don't know. |

*Id.* at 91:24 – 92:21 (emphasis added).

Gonzalez nailed down the timing. He first contacted Ms. Dymkar "months after the incident." *Id.* at 28:21. He clarified that he first contacted her "less than a year after the incident." *Id.* at 28:22-24.

Gonzalez confirmed that he reached out to his current attorney *before* – not after – filing for bankruptcy:

> Q: Okay. Is it fair to say that it was less than a year after the incident?
>
> A: Yes.
>
> Q: Okay. So then is it fair to say that you had first contacted Ms. Dymkar before you filed your bankruptcy petition on January 12, 2017?
>
> A: I – I believe that's true. She – I spoke to her, then then my bankruptcy was filed afterwards, yes.
>
>         \*       \*       \*
>
> Q: Just so we're clear, you met the attorney that listened to you, Ms. Dymkar, before you filed the bankruptcy, correct?
>
> A: Yes.

*Id.* at 28:22 – 29:4, 41:1-3.

But Gonzalez disagreed with the notion that he wanted to talk with a lawyer about filing a potential claim. He wanted to talk with a lawyer about his *rights*. *Id.* at 29:5-10. "I did not know I had a claim or a lawsuit. All I know, that I had rights, and I wanted to have a consult to hear me out." *Id.* But he felt that the police had violated his rights. "I felt that way, but I'm not a lawyer. So I – I don't know how to respond because it's a legal matter. And I'm – I'm a victim, not a lawyer." *Id.* at 29:13-15.

Gonzalez then addressed why he did not disclose the potential claim against the police in his original bankruptcy petition. Right off the bat, Gonzalez took the position that there was nothing to disclose because he hadn't filed a lawsuit yet:

> Q: Okay. Now, is it fair to say – I think it is, but would you agree with me that you did not list this lawsuit or potential lawsuit as an asset in your bankruptcy filings when you filed them originally?
>
> A: I had no intention of – of, you know, not claiming this because I did not know I had a claim or a lawsuit. There was no claim. There was no demand for payment. There was no lawsuit filed.
>
> I'm not a lawyer. And anybody on the street in this situation will find themselves making that call, whether they have a lawsuit or not.
>
> Do you have a lawsuit when you don't have a lawsuit? I – I would say no, you don't have a lawsuit till you actually file a lawsuit, or if you're asking for payment, if there's some kind of payment that you're requiring. None of those existed at the time.

*Id.* at 32:2-15.

The City's counsel asked why Gonzalez did not disclose this lawsuit in his original bankruptcy petition. Gonzalez offered the following explanation:

> Q: Okay. Why did you not list this lawsuit in that paragraph [of the bankruptcy petition], when that paragraph says "whether or not you have filed a lawsuit"?
>
> A: At the time I did not know I had a claim or a lawsuit or a demand for payment. Many things happened to me, and I would have to list page by page all the things that have happened to me where I believe there's a potential lawsuit or a claim. It could be a car accident. It could be somebody pushed me on the street.
>
> So when I read that, I followed a dictionary where it told me that if there is a claim, you would have to have a Court hear it. And that was my basis of answering that question the way I did, because I did not have a claim, I did not have a demand for payment, and I did not have a lawsuit.

> The only thing that I did was talk to an attorney who dropped it,
> called other attorneys who weren't interested or who didn't get
> back to me, and then talked to – finally I met an attorney who
> listened to me.
>
> And then I had to file bankruptcy.

*Id.* at 40:7-25.  Counsel later asked a follow-up, asking why Gonzalez did not list this incident as

a *potential* claim.  He responded:

> Q:    That's – yeah, and that's a good point, Mr. Gonzalez.  Why did
>       you not list this incident as a potential claim that you may bring in
>       a future lawsuit when you filed your bankruptcy?
>
> A:    If you heard my answer previously regarding Illinois Advocates,
>       they heard me on a consultation, and they punted.  They said,
>       "We're not going to take this case."
>
>       This reflected on my decision on answering 33 [*i.e.*, Question No.
>       33 on the original bankruptcy petition].  I do not – and I will repeat
>       it again and again as many times as you want to hear me.  At the
>       time I believe I had no intent that I had a claim.  I believed that I
>       had no lawsuit.  I believed that I had no payment demand to
>       Chicago Police.
>
>       The only thing I did was to exercise my right as a citizen to seek
>       counsel from an attorney who handles something like this.

*Id.* at 41:17 – 42:5.

Gonzalez went round and round, parsing the distinction between a claim and a potential

claim.  *Id.* at 96:5 – 101:6.  He seemed to take the position that he didn't have a potential claim

because he hadn't filed a lawsuit yet.  *Id.* at 33:15-17 ("The answer is that I had no intention of

claiming or filing a lawsuit when I did not know that there was a claim or a lawsuit.").

Gonzalez took pains to point out that he had no claim against the police because he had

not yet filed a lawsuit.  The following passage captures his position:

The Court:  Did you think that you had no obligation to disclose potential claims?

A:  Potential claims, yes.

The Court:  Okay.  Did you –

A:  I –

The Court:  Did you – I'm sorry.  Go ahead.

A:  I will just say that if it was potential claim, yes.  If you're talking to an attorney about something that happened to you and you don't know what it is, I had to answer no for that.  I – I do not have any claim or filing of lawsuit or demand on payment on record or in conversation in any form.

The Court:  So did you understand that you had an obligation to disclose a potential claim?

A:  Yes.

The Court:  Okay.  What did you understand a potential claim to be?

A:  Here it says "claims against third parties," not "potential claims." So that has to – that changes the question.

But here it does say "claims against third parties."  Did I have a claim against third parties?  No.  Did I know I had a federal lawsuit?  No, I did not know that.  Whether there was one to be filed or not, I don't know.  I did not know.  And the third part, "or made a demand for payment."  There was nothing on record.

The only thing that's on record, consultation with an attorney after a previous attorney dropped a consultation with them, which was Illinois Advocates, and a filing on September 2017.

So I had no knowledge of this being a claim, a potential lawsuit, or a demand for payment.  The only thing I knew was I was exercising my rights and speaking to an attorney and waiting for an outcome.

The Court:  Do you see where it says "whether or not you have filed a lawsuit"?

A:  Yes.

66

| The Court: | What did you think the phrase "whether or not you have filed a lawsuit" means? |
|---|---|
| A: | I means from my point of view whether there is a lawsuit filed or not, if – if it was tending to be a lawsuit. I had no knowledge of this being a lawsuit or not being a lawsuit. The only thing I had was a consultation with an attorney, and I was waiting for a response of it [sic] going to be a lawsuit or not. |

*Id.* at 96:16 – 98:7.

When asked, Gonzalez could not put a number on the value of his claim. He wanted the jury to decide:

| Q: | So it's fair to say that you believe that your injuries are worth more than a dollar. Is that right? |
|---|---|
| A: | It's up to a jury. It could be zero; it could be infinity. I have no idea. God bless who – however it ends up. |
| The Court: | Did you ever tell the bankruptcy trustee that your damages might be infinity? |
| A: | No. |

*Id.* at 65:7-13; *see also id.* at 112:8-11 ("But again, I had no knowledge of it being worth 45,000 or anything else except that we were under the guidance that this will be going to trial by jury, and we have no knowledge of any amount of what the value of this case is.").

Gonzalez then blamed the bankruptcy form. "This person who wrote this document or paper made an *error. They should have just put 'potential' right in the beginning*, and therefore I would have answered yes." *Id.* at 99:22-25 (emphasis added); *id.* at 99:2-4 ("When you put – had this – had this [sic] would have been reworded 'potential lawsuits' or 'potential claims,' I would have answered differently."); *id.* at 101:2-6.

He seemed to paint himself as a victim: "*But the English that is used on this sentence has got to be changed so that this does not happen to somebody else.* It states, 'Claims against third

parties,' not 'potential claims.' And I don't want to sound smart-aleck. But you have to put –

words are important, very important, especially in a lawsuit." *Id.* at 100:1-6 (emphasis added).

### 7. The Retention Agreement

After the evidentiary hearing, another shoe dropped. The biggest shoe of them all.

This Court noticed that his amended bankruptcy petition contemplated sharing a portion

of any recovery with Plaintiffs' counsel. That petition stated that Gonzalez would receive half of

any award (his former wife would get the other half), "minus attorneys' fees, set at 40% of the

total settlement amount." *See* Am. Bankruptcy Petition (Dckt. No. 157-2).

That statement suggested that there was a retention agreement. Presumably there was an

agreement establishing the 60/40 split between the client and the lawyer. And that agreement

would show when, exactly, Gonzalez retained counsel.

This Court wanted to know whether Gonzalez entered into a retention agreement before,

or after, filing the original bankruptcy petition. The retention agreement could help shed light on

when Gonzalez knew that he had a potential claim. The retention of a lawyer to pursue a

potential claim is relevant to whether a person is aware of the existence of a potential claim (and

thus aware of something of value), and when.

An agreement about how to split a potential recovery would reflect an awareness that

there might *be* a potential recovery. And an awareness of a potential recovery would go to

whether Gonzalez intended to deceive when he failed to disclose the potential claim to the

bankruptcy court.

So this Court ordered Gonzalez to file a copy of the retention agreement (under seal, if

necessary). *See* 3/5/21 Order (Dckt. No. 175). A retention agreement is not privileged. *See In*

*re Walsh*, 623 F.2d 489, 494 (7th Cir. 1980) ("As a general rule, matters involving the receipt of

68

fees from a client are not privileged as they do not involve confidential communications. . . .

The grand jury may thus view the documents sought by the subpoena, including ledgers, bills,

time records, and retainer agreements."); *Epstein v. Am. Reserve Corp.*, 1985 WL 2598, at *3

(N.D. Ill. 1985) (noting that "fee arrangements are not ordinarily subject to the attorney-client

privilege"); *see also* 1 American Bar Association, *Attorney-Client Privilege & the Work-Product

Doctrine* § III.E1.E.5, at 131 (6th ed. 2017) ("Federal courts uniformly allow the identity of the

client and matters regarding fee arrangements to be discovered, except in very limited

circumstances when that discovery would actually reach client confidences. The rational[e] for

such discovery is twofold. First, fee arrangements are viewed as incidental to the attorney-client

relationship and do not usually involve disclosure of confidential communications arising in the

context of the professional relationship. Second, because the attorney-client privilege restricts

the availability of relevant information to a fact-finder, the privilege is applied only to the extent

necessary to achieve its purpose of protecting confidences made to obtain legal advice.") (citing

cases); *see also id.* at § III.E1.E.3, at 125 (6th ed. 2017) ("Nor does the privilege extend to the

general nature of the legal services the attorney was retained to perform or to the terms and

conditions of the attorney's engagement.").

Gonzalez responded by filing a motion for a stay. *See* Mtn. (Dckt. No. 177). He then

filed a petition for a writ of mandamus with the Seventh Circuit. *See* Petition for Writ of

Mandamus, at 3, *In re Juan Gonzalez*, No. 21-1440 (7th Cir. March 10, 2021). And then

Gonzalez filed a second motion for a stay before this Court. *See* Mtn. (Dckt. No. 181). He

reiterated that he objected to the evidentiary hearing – which had taken place a week earlier –

and repeated that he had filed four motions objecting to the hearing (as an aside, this Court had

already ruled on all of them). *Id.* at ¶ 4; *see also* 3/15/21 Order (Dckt. No. 184) ("There was no need for yet another motion to repeat motions that the Court already ruled upon.").

The Seventh Circuit denied the petition a few days later. *See* 3/15/21 Order (Dckt. No. 183). So this Court ordered Plaintiffs' counsel to file the retention agreement, with leave to file any privileged portions (if any) under seal. *See* 3/15/21 Order (Dckt. No. 184). But this Court directed Gonzalez to submit the "complete, unredacted version." *See* 3/5/21 Order (Dckt. No. 175).

Gonzalez responded by filing a *redacted* copy, and yet another motion. *See* 6/7/16 Retainer for Legal Services (Dckt. No. 187-1); Mtn. (Dckt. No. 187).

After receiving a redacted copy (only), this Court still did not know the full story. So this Court once again ordered Gonzalez to submit an unredacted copy (and later confirmed that it would be an *in camera* inspection). *See* 3/16/21 Order (Dckt. No. 189) ("The redacted material is relevant to whether Plaintiff Gonzalez intended to conceal an asset, including his knowledge of the potential value of the asset. The redacted material also is relevant to whether anyone committed a fraud on the court."); 3/16/21 Order (Dckt. No. 192).[15]

Gonzalez, at long last, submitted an unredacted copy of the retention agreement. *See* 6/7/16 Retainer for Legal Services (Dckt. No. 191-1). The retention agreement confirmed that Gonzalez retained Plaintiffs' counsel to pursue a possible claim against the police about the 2015 incident on June 7, 2016. *Id.* at 3 of 3.

Putting that date in perspective, Gonzalez retained his attorney only eight months after the incident at his house on October 1, 2015. And more importantly, Gonzalez retained counsel seven months before filing for bankruptcy in January 2017.

---

[15] Defense counsel ultimately received the redacted version (Dckt. No. 187-1), but not the unredacted version (Dckt. No. 191-1). *See* Defs.' Statement (Dckt. No. 193).

The very first paragraph made clear the purpose of the retention. He retained counsel to investigate the incident with the police, and pursue a possible claim. "Juan Gonzalez (Client) hereby retains and employs IRENE K. DYMKAR (Attorney) to pursue any claim whatsoever which client may have for damages resulting from alleged police misconduct which occurred on or about 10/1/15." *See* 6/7/16 Retainer for Legal Services, at 1 of 3 (Dckt. No. 191-1).[16]

The agreement contemplated a potential claim for "damages" in federal district court. *Id.* "The Attorney shall investigate and prosecute an action in federal district court based upon the allegations of police misconduct which have been reported and described to her. Should the investigation of this matter result in the Attorney's determination or opinion that it is not advisable to commence a lawsuit or continue prosecuting a lawsuit, then the Attorney shall inform the Client of same." *Id.* at ¶ 1.

The retention agreement covered the attorneys' fees. Gonzalez agreed that counsel would receive "forty percent (40%) of the recovery," or fees based upon a lodestar, whichever was greater. *Id.* at ¶ 5. So Gonzalez knew that he was entitled to receive the remaining 60% of any recovery. *Id.*

Plaintiffs' counsel then did the impossible (or, at least, did what she told the Court was impossible.). Plaintiffs' counsel gave Gonzalez an estimate of the value of his claim. Meaning a specific, dollars-and-cents estimate. Right down to the dollar.

---

[16] On March 5, 2021, this Court gave Gonzalez leave to file a redacted version of the retention agreement on the public docket, and an unredacted version under seal, if he believed that the agreement contained privileged information. *See* 3/5/21 Order (Dckt. No. 175). In response, Gonzalez filed a redacted version on the public docket, and redacted only the portion of the retainer agreement that assigned a specific monetary value to the potential claim. *See* 6/7/16 Retainer for Legal Services (Dckt. No. 187-1). So Gonzalez necessarily believes that there was nothing confidential about the rest of the document, because he filed it on the public docket despite having leave to file it under seal. In any event, there is nothing confidential about the portions quoted in this Opinion.

"It is agreed that the Attorney has made no guarantee regarding the success of any claim or causes of action for which she has been retained.  The Client has been advised and agrees that a rough initial estimate of the total value of the total claim for all Clients retaining the Attorney for this incident ranges from $**[REDACTED]** to $**[REDACTED]**, although there is no guarantee of this.  The Client acknowledges agreement to this by placing his/her initials here." *Id.* at ¶ 14.

Right below that specific, down-to-the-dollar "estimate of the total value of the total claim," a set of handwritten initials appeared.  "JG." *Id.*

### 8.  The Takeaways

The story was long, but the key takeaways are relatively straightforward.

First, Gonzalez believed right away that the police had violated his rights.  He contacted the Independent Police Review Authority on the same day as the incident, and complained about what happened.

Second, Gonzalez contacted counsel right away.  He reached out to Illinois Advocates a few days after the police entered his home.

Third, Gonzalez searched long and hard for an attorney.  After Illinois Advocates refused to take the case, Gonzalez continued to search for legal counsel.  He didn't call one or two lawyers.  He contacted up to 20 different attorneys.

Fourth, Gonzalez retained Irene Dymkar, his current attorney, in June 2016.  That's seven months before filing for bankruptcy.  He hired her to bring a possible claim for damages against the police in federal district court.  Plaintiffs' counsel gave him a specific estimate of the value of the claim.  The attorney told Gonzalez that his claim was worth between $X and $Y.  The unredacted retention agreement includes precise dollar amounts.

Fifth, Gonzalez filed for bankruptcy in January 2017, and answered questions under oath. The form asked Gonzalez about "[o]ther amounts someone owes you." The form also asked if he had any "[c]laims against third parties, whether or not you have filed a lawsuit or made a demand for payment." It asked about "contingent and unliquidated claims of every nature," too.

Sixth, Gonzalez didn't say a word about the 2015 incident with the police in his 2017 bankruptcy petition. He didn't mention anything about retaining a lawyer (in 2016) to pursue a claim for damages in federal district court, either. He also didn't disclose the estimate from his lawyer – in the range of thousands of dollars – about the value of a possible claim. He answered: "No."

He filed this lawsuit eight months after filing for bankruptcy.

### B.      Judicial Estoppel

Based on the record, the doctrine of judicial estoppel prevents Gonzalez from advancing any claims. This Court finds that Gonzalez failed to disclose a potential claim against the police when he filed for bankruptcy, and did so intentionally.

"Judicial estoppel is a doctrine of discretion that is intended to protect the integrity of the judicial process." *See Juza v. Wells Fargo Bank, N.A.*, 794 F. App'x 529, 535 (7th Cir. 2020); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (noting that "courts have uniformly recognized that its purpose is 'to protect the integrity of the judicial process'") (citation omitted); *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) ("[T]he purpose of the doctrine . . . is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant . . . ."); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine designed to prevent the perversion of the judicial process."); 18B Charles Alan Wright *et al.*, *Fed. Practice & Procedure* § 4477 (2d ed. 2020). The doctrine "protect[s] courts and creditors

73

from deception and manipulation," *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014), and "prevent[s] litigants from 'playing fast and loose with the courts,'" *In re Cassidy*, 892 F.2d at 641 (citation omitted).

"The doctrine of judicial estoppel prevents litigants from manipulating the judicial system by prevailing in different cases or phases of a case by adopting inconsistent positions." *Spaine*, 756 F.3d at 547. "A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory." *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993); *see also Williams v. Hainje*, 375 F. App'x 625, 627 (7th Cir. 2010) ("Broadly speaking, judicial estoppel precludes a party from abandoning positions after they have prevailed on them in earlier litigation."); *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) ("It is intended to protect the courts from being manipulated from chameleonic litigants who seek to prevail, twice, on opposite theories.").

A prime example of the "[m]anipulation" of the judicial process occurs "when a debtor deliberately conceals a contingent or unliquidated claim during bankruptcy proceedings and then later seeks to profit from that claim after obtaining a discharge of her debts." *Spaine*, 756 F.3d at 547; *Matthews v. Potter*, 316 F. App'x 518, 522 (7th Cir. 2009) ("[C]ourts consistently hold that a debtor who conceals a legal claim and denies owning the asset in bankruptcy is judicially estopped from later pursuing that claim to the debtor's personal benefit."); *Williams*, 375 F. App'x at 627 ("In the bankruptcy setting, a debtor who receives a discharge by concealing the existence of a chose in action cannot wait until the bankruptcy ends and then pursue the claim."); *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006) ("All six appellate courts that have considered this question hold that a debtor in bankruptcy who denies owning an asset, including

a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends.").

"Plenty of authority" supports the notion that "a debtor in bankruptcy who receives a discharge (and thus a personal financial benefit) by representing that he has no valuable chose in action cannot turn around after the bankruptcy ends and recover on a supposedly nonexistent claim." *Biesek v. Soo Line R.R. Co.*, 440 F.3d 410, 412 (7th Cir. 2006); *see also Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) ("The rationale for these decisions is that the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. . . . The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete.").

A debtor cannot tell the bankruptcy court that a claim is worthless or non-existent, and then turn around and tell a district court that a claim has value. "[A] debtor is judicially estopped from litigating after the bankruptcy ends; having told the bankruptcy court implicitly that any tort claim had no value; and having received a discharge in response, the debtor is estopped from contending in a later suit that the claim is valuable." *See Metrou v. M.A. Mortenson Co.*, 781 F.3d 357, 358 (7th Cir. 2015).

Part of the problem is the fact that a party is attempting to win – twice – on opposite theories. *See Astor Chauffeured Limousine Co. v. Runnefeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990) ("The offense is not taking inconsistent positions so much as it is *winning*, twice, on the basis of incompatible positions.") (emphasis in original). But another (perhaps bigger) part of the problem is that a party is *deceptive* – even if it happens only once. *See Grochocinski*

75

*v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 797 (7th Cir. 2013) (noting that preventing courts from being "abused and misled" is "a core purpose of judicial estoppel"); *Cannon-Stokes*, 453 F.3d at 448 (noting that the doctrine "induces debtors to be truthful in their bankruptcy filings"); *McNamara v. City of Chicago*, 138 F.3d 1219, 1225 (7th Cir. 1998) ("If repudiation [of an earlier successful position] were permitted, the incentive to commit perjury and engage in other litigation fraud would be greater."); *Chaveriat*, 11 F.3d at 1428 ("By making them choose one position irrevocably, the doctrine of judicial estoppel raises the cost of lying."). Courts have an institutional interest in rooting out dishonesty *to courts*.

Judicial estoppel is an "equitable doctrine." *See Cannon-Stokes*, 453 F.3d at 448. It is "a matter of discretion." *See Williams*, 375 F. App'x at 627; *see also In re Cassidy*, 892 F.2d at 642 ("Estoppel is an equitable concept, and its application is therefore within the court's sound discretion.").

Hard-and-fast rules do not apply. "Judicial estoppel is a flexible equitable doctrine that is not 'reducible to any general formulation of principle' and accordingly does not lend itself to rigid rules." *Grochocinski*, 719 F.3d at 796 (quoting *New Hampshire*, 532 U.S. at 750). Courts consider factors such as whether a party took inconsistent positions, whether the party succeeded in the first position, and whether the party would gain an unfair advantage or impose an unfair detriment on the opposing party. *Id.* But those factors are "general guideposts," and "not a rigid test that must be applied every time the issue of judicial estoppel is raised." *In re Knight-Celotex, LLC*, 695 F.3d 714, 722 (7th Cir. 2012).

Overall, a district court "needs freedom to consider the equities of an entire case." *See Grochocinski*, 719 F.3d at 796. A court can consider "all the relevant equities" in the case at hand. *In re Knight-Celotex, LLC*, 695 F.3d at 722; *see also* 18 James Wm. Moore *et al.*, *Moore's*

76

*Federal Practice* § 134.31 (3d ed. 2020) ("Because the doctrine is equitable in nature, it should be applied flexibly, with an intent to achieve substantial justice.").

District courts can raise the issue of judicial estoppel on their own, and for good reason. Judicial estoppel is about protecting the courts, and courts have an interest in protecting themselves. *See Grochocinski*, 719 F.3d at 795 ("It may be raised by any party, regardless of whether the party was prejudiced by the inconsistency, or by the court on its own motion."); *In re Cassidy*, 892 F.2d at 641 ("The doctrine of estoppel is intended to protect the courts rather than the litigants, so it follows that a court, even an appellate court, may raise the estoppel on its own motion in an appropriate case.").

The Seventh Circuit has drawn a dividing line between intentional non-disclosure and inadvertent non-disclosure. A debtor who acts in good faith – but mistakenly omits a potential claim in a bankruptcy schedule – might not lose the claim through judicial estoppel. *See Metrou*, 781 F.3d at 358–60; *Williams*, 375 F. App'x at 627. A good example is a debtor who fails to include a potential claim in the written schedule – for innocent reasons – but later discloses it orally to the trustee at the creditors' meeting (before discharge). *See Spaine*, 756 F.3d at 546–47 ("That is not to say that Spaine's oral disclosure of the lawsuit would necessarily foreclose use of judicial estoppel if Community Contact could prove that Spaine's omission, though later cured, was an intentional effort to conceal an asset from her creditors."); *Matthews*, 316 F. App'x at 522. But an intentional non-disclosure is another story.

After considering the record, and weighing the equities, this Court finds that Gonzalez deliberately misled the bankruptcy court by failing to disclose a potential claim against the police. The non-disclosure of the potential claim was not an accident or an oversight. It was an attempt to keep the damages for himself.

Consider, for starters, what transpired. The police entered Gonzalez's home in 2015, and according to him, pointed a gun at his face. *See* Gonzalez Dep., at 43:2 – 45:15 (Dckt. No. 124-11). The episode was "frightening." *See* Mtn., at 5 (Dckt. No. 149); *see generally* Gonzalez Dep., at 83:2 – 93:23. He testified that the encounter forced him to lose sleep – he has had nightmares, and "[m]any" sleepless nights. *Id.* at 88:8 – 93:23.

He testified about his fear, too. "I was scared. I thought I was going to get my head blown off." *Id.* at 83:6-7. He testified about his continuing fear of the police. *Id.* at 88:11-17. And he testified that he doesn't feel safe in his home anymore. *Id.* at 86:2-19. He seeks emotional distress damages because he claims that he was traumatized. *See* 3/3/21 Tr., at 60:4-17 (Dckt. No. 201) (describing his ongoing fear of the police in 2021); *id.* at 60:7-10 ("My – my words are that I am – fear the police. I have a fear with them now.").

The nature of the incident makes it unlikely that Gonzalez overlooked it. Gonzalez testified about a traumatizing event that had significant, long-term impacts on him. That's not the type of thing that a person would easily forget.

This case doesn't involve a situation where a person does not realize right away that his or her rights were violated. Quite the opposite. From day one, Gonzalez objected to the search and believed that the police had violated his rights. He called the Independent Police Review Authority on the same day that the police searched his home. *See* Gonzalez Dep., at 74:2 – 76:11 (Dckt. No. 124-11).

And then he embarked on a search for lawyers. In fact, he reached out to Illinois Advocates only a few days after the incident in October 2015. *See* 3/3/21 Tr., at 93:7-8 (Dckt. No. 201); *see also id.* at 101:22 – 102:24 (confirming that he contacted Illinois Advocates

"days," not "months," after the incident). That call revealed an awareness, early on, that he might have a potential claim.

When Illinois Advocates declined the case, Gonzalez kept looking for lawyers. He placed a lot of calls, to a lot of lawyers. In fact, Gonzalez testified that he may have called up to 20 lawyers. *Id.* at 91:24 – 92:21.

He cast a wide net, again and again, searching for counsel. Everything about that effort – the volume of the calls, the persistence of the search, and the scope of the inquiries – shows an awareness of a potential claim. People don't tend to call 20 lawyers unless they think they have a claim.

Gonzalez wasn't calling lawyers simply because he wanted someone to talk to. As Gonzalez later admitted, he "continued to search for an attorney *to bring a lawsuit about the search* and retained Irene Dymkar." *See* Petition for Writ of Mandamus, at 3, *In re Juan Gonzalez*, No. 21-1440 (7th Cir. March 10, 2021) (emphasis added).

Gonzalez ultimately retained counsel in June 2016. *See* 6/7/16 Retainer for Legal Services, at 3 of 3 (Dckt. No. 191-1). That's seven months before he filed for bankruptcy in January 2017. So, more than half a year before filing for bankruptcy, Gonzalez knew that filing a lawsuit was a distinct possibility.[17]

---

[17] In his mandamus petition before the Seventh Circuit, Gonzalez gave a misleading characterization of the chronology. Gonzalez stated: "That attorney [from Illinois Advocates] declined to represent petitioner, but another attorney from that firm subsequently agreed to represent petitioner in a bankruptcy proceeding. . . . Petitioner continued to search for an attorney to bring a lawsuit about the search and retained Irene Dymkar." *See* Petition for Writ of Mandamus, at 3, *In re Juan Gonzalez*, No. 21-1440 (7th Cir. March 10, 2021). That was not the sequence of events. He retained counsel to bring a lawsuit *before* filing for bankruptcy, not the other way around. Gonzales retained Irene Dymkar in June 2016, and filed for bankruptcy in January 2017. The passage above suggests the opposite – it mentions the bankruptcy filing, and then says that Gonzalez "continued to search for an attorney."

Gonzalez retained her for a very specific reason: to consider bringing a claim against the police for the incident from October 2015. "Juan Gonzalez (Client) hereby retains and employs IRENE K. DYMKAR (Attorney) *to pursue any claim whatsoever which client may have for damages* resulting from alleged police misconduct which occurred on or about *10/1/15*." *See* 6/7/16 Retainer for Legal Services, at 1 of 3 (Dckt. No. 191-1) (emphasis added).

Gonzalez knew full well that filing a lawsuit was a distinct possibility. In fact, the agreement contemplated a potential claim for "damages" in federal district court. *Id.* "The Attorney shall investigate and prosecute an action *in federal district court* based upon the allegations of police misconduct which have been reported and described to her." *Id.* at ¶ 1 (emphasis added).

Gonzalez knew that the claim had value, too. The agreement included a fee arrangement that entitled him to receive 60% of any potential recovery. *Id.* at ¶ 5. Gonzalez may not have known what that recovery would be. But he did know that he would be entitled to receive 60% of the pie, whatever it was.

If the agreement said nothing else, it would establish beyond question that Gonzalez knew about a potential claim long before filing for bankruptcy. But here, the agreement went one step further. Plaintiffs' counsel gave him an estimate about the value of the claim. She gave him a "rough initial estimate," and pegged it to a number. To the dollar.

"It is agreed that the Attorney has made no guarantee regarding the success of any claim or causes of action for which she has been retained. The Client has been advised and agrees that a rough initial estimate of the *total value* of the *total claim* for all Clients retaining the Attorney for this incident ranges from $**[REDACTED]** to $**[REDACTED]**, although there is no

80

guarantee of this. The Client acknowledges agreement to this by placing his/her initials here." *Id.* at ¶ 14 (emphasis added).

The Court received an unredacted copy for an *in camera* inspection. The document includes a handwritten estimate of the "total value" of the claim, from $X to $Y. Gonzalez's attorney told him that the claim had value, and she quantified it.

Gonzalez didn't overlook it. He read it. The agreement shows that he signed his initials, less than an inch away. "JG." *Id.*

Long before he filed for bankruptcy, Gonzalez knew that he had a potential claim. And he knew that it had value. The facts allow only one possible conclusion. Gonzalez did not make a mistake when he neglected to mention it in his bankruptcy petition. He failed to disclose the potential claim, and did so intentionally.

### C.     Gonzalez's Response

Gonzalez did not help his cause at the evidentiary hearing. A good portion of the time, Gonzalez attempted to play word games. He tied himself in linguistic knots, peddling the notion that the bankruptcy form does not cover potential claims. He went so far as to suggest that the form is wrong, painting himself as a victim.

The bankruptcy schedule is about as clear as it could be. Gonzalez had a duty to disclose any "[c]laims against third parties, *whether or not you have filed a lawsuit* or made a demand for payment." *See* Chapter 7 Petition, at 14 of 54 (Dckt. No. 172) (emphasis added). The question covered claims, and *potential* claims. That was the whole point of the phrase "whether or not you have filed a lawsuit." *Id.*

The very next question asked about any "[o]ther contingent and unliquidated claims of every nature." *Id.* And the following question was a catch-all, covering "[a]ny financial assets

81

you did not already list." *Id.* The form embraced everything, and excluded nothing. *See Cannon-Stokes*, 453 F.3d at 447 (noting that the all-encompassing language of the bankruptcy schedule, which asked about "contingent and unliquidated claims of every nature," left "no room for quibbles").

Gonzalez points to the fact that he later filed an amended bankruptcy petition and disclosed the existence of this lawsuit. That belated disclosure was no act of valor. He disclosed the existence of this lawsuit to the trustee on July 17, 2018. *See In re Juan Gonzalez*, 17-bk-00895 (Bankr. N.D. Ill.) (Dckt. No. 22 in the bankruptcy docket). The disclosure took place after defense counsel forced his hand, by inquiring about the non-disclosure at deposition.

A party cannot wipe away an intentional falsehood by belatedly telling the truth, especially after getting caught. *See, e.g.*, *Novotny v. Plexus Corp.*, 777 F. App'x 164, 165 (7th Cir. 2019) (affirming the entry of summary judgment against the plaintiff-debtor based on judicial estoppel, even though he "moved to reopen his bankruptcy so that he could amend his disclosure of assets to add his discrimination claims from this lawsuit"); *Douglas v. I.Q. Data Int'l, Inc.*, 2021 WL 2000282, at *3–4 (N.D. Ill. 2021) (dismissing a case on judicial estoppel grounds despite a belated disclosure to the bankruptcy court); *Hernandez v. Forest Pres. Dist. of Cook Cty.*, 2010 WL 1292499, at *5 (N.D. Ill. 2010) (Dow, J.) ("District courts in this circuit likewise have concluded that the doctrine of judicial estoppel applies despite the plaintiff's effort to amend his bankruptcy schedule."); *Bland v. Rahar*, 2008 WL 109388, at *3 (C.D. Ill. 2008) (finding that it "does not matter" that the debtor "quickly moved to amend his bankruptcy disclosures"); *Wiggins v. Citizens Gas & Coke Util.*, 2008 WL 4530679, at *3 (S.D. Ind. 2008) ("The cases are uniform that corrective action taken only after being 'caught' and compelled to do so by one's opponent is too late; it is not a defense to the application of judicial estoppel.").

82

Courts depend on truth-telling. And bankruptcy courts, in particular, rely on full disclosure by debtors. Without it, creditors might get the shaft. It would create bad incentives if debtors could escape the consequences of non-disclosure by telling the truth after the fact. Lowering the cost of non-disclosure would lead to more non-disclosure.

Belated truth-telling does not cure earlier falsehoods. As Judge Tinder once explained: "The reopening of a closed bankruptcy case to disclose a claim previously known but not disclosed as an asset does not render judicial estoppel inapplicable. The bankruptcy and district courts are *still burdened by the party's attempt at deception* . . . and the doctrine is intended to protect the integrity of the judicial process." *See Back v. Town of Cloverdale*, 2001 WL 987832, at *3 (S.D. Ind. 2001) (Tinder, J.) (emphasis added).

Gonzalez points to the fact that the bankruptcy trustee later questioned him about the nature of his claim, and decided that the "lawsuit should be abandoned." *See* Mtn., at 4 (Dckt. No. 152); *see also* 2/11/21 Tr., at 8:7-10 (Dckt. No. 156). That makes no difference. The trustee and the Court sit in different seats, and wear different hats. They ask different questions, too.

The trustee's job is to maximize the recovery for creditors, and must decide whether a claim is worth pursuing, from an economic perspective. A trustee must weigh the value of the claim, as well as the cost and disruption of reopening a closed bankruptcy case. *See Scoggins v. Arrow Trucking Co.*, 92 F. Supp. 2d 1372, 1376 (S.D. Ga. 2000). The Court, in contrast, is not so concerned with dollars and cents. The Court must protect the integrity of the judicial process itself.

Gonzalez did not exactly come clean to the bankruptcy trustee, either. Gonzalez didn't mention anything about a gun pointed at his face. He didn't divulge sleepless nights, or

nightmares, or fear of the police, or emotional trauma. He didn't say anything about Judge Castillo's assessment of the value of the case during the April 2018 settlement conference.

Gonzalez also argues that a jury, not a court, must decide the issue of judicial estoppel. *See* Mtn. (Dckt. No. 148); Pls.' Mem. (Dckt. No. 186). Not so. The Seventh Circuit has repeatedly upheld determinations by district courts on the issue of judicial estoppel, including cases with factual disputes about whether a debtor acted intentionally. *See Novotny*, 777 F. App'x at 165 (affirming the district court's "finding" that the omission was intentional); *Williams*, 375 F. App'x at 627 (affirming summary judgment when the district court "determined that Williams had intentionally concealed the lawsuit" and "concluded that judicial estoppel precluded him from pursuing it for his own benefit"); *Matthews*, 316 F. App'x at 523 (noting that the district court "must make a factual determination, by evidentiary hearing if necessary, regarding the nature and extent of the disclosures Matthews made to the Chapter 7 trustee"); *see also Pruitt v. Quality Labor Servs., LLC*, 2018 WL 5808461 (N.D. Ill. 2018) (resolving the issue of judicial estoppel after holding an evidentiary hearing and making credibility determinations). "It is, in short, a doctrine for the Court, not for a jury, to assess and, if warranted, apply." *See Ellis v. Alexander*, 2018 WL 1942650, at *4 (N.D. Ill. 2018).

The reason stems from the very nature of judicial estoppel. "[J]udicial estoppel is an *equitable* doctrine invoked by a *court* at its *discretion*." *New Hampshire*, 532 U.S. at 750 (cleaned up) (emphasis added). It is an "equitable concept designed to prevent the perversion of the judicial system." *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1193 (7th Cir. 1992); *see also* 18 James Wm. Moore *et al.*, *Moore's Federal Practice* § 134.31 (3d ed. 2020) ("Because the doctrine is designed to protect the integrity of the judicial system, judicial estoppel is

84

frequently described as equitable or discretionary in nature.  Because the doctrine is equitable in nature, it should be applied flexibly, with an intent to achieve substantial justice.").

It is the job of a judge to protect the integrity of the judicial process and "prevent the perversion of the judicial system."  *Allison*, 979 F.2d at 1193.  And judges, not juries, are best positioned to do the sort of flexible weighing of factors that the application of the doctrine requires.  A jury finds facts, but a judge is better situated to determine when application of judicial estoppel would "achieve substantial justice."  *See* 18 James Wm. Moore *et al.*, *Moore's Federal Practice* § 134.31 (3d ed. 2020).

Other features of the doctrine bolster that conclusion.  A court can raise judicial estoppel *sua sponte*.  *See New Hampshire*, 532 U.S. at 750 ("Because the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion.'") (citations omitted).  And if a court can raise the doctrine on its own, it is not a stretch to think it can also decide it.  In a similar vein, a court is not bound to accept a party's waiver of the doctrine.  *See Bethesda Lutheran Homes & Servs., Inc. v. Born*, 238 F.3d 853, 857–58 (7th Cir. 2001).  The judiciary is the guardian of the integrity of its own proceedings.  And when judicial estoppel is at issue, institutional interests are at play.

Plus, the appellate standard of review for judicial estoppel is abuse of discretion.  *See Grochocinski*, 719 F.3d at 795 ("Because the doctrine is a 'matter of equitable judgment and discretion,' we review a district court's application of the doctrine for an abuse of that discretion."); *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012).  A jury's decision, on the other hand, is overturned "[o]nly if no rational jury could have found for the nonmovant."  *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019).  The abuse of discretion standard of review suggests a *discretionary* judgment call by the district court, not the jury.

85

Gonzalez relies on the Seventh Circuit's decision in *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014), but that case does not stand for the proposition that judicial estoppel is a question for the jury. In *Spaine*, the district court granted summary judgment based on judicial estoppel because the debtor failed to disclose a potential claim on the bankruptcy schedule. But the debtor presented evidence that she disclosed the potential claim *orally* – a fact that the district court did not consider. *Id.* at 548 ("If there were undisputed evidence that Spain intentionally concealed her claim, we would agree. As noted above, though, the district court overlooked Spaine's testimony about her oral disclosure during the bankruptcy."). So the Seventh Circuit sent it back. The Seventh Circuit never said that, on remand, the jury needed to decide if judicial estoppel applied.

Ultimately, the judge-or-jury question makes no difference. On this record, no reasonable jury could find that Gonzalez failed to disclose his potential claim for innocent reasons.

### D. The Statements by Gonzalez, and by Plaintiffs' Counsel

One final word. The Court is concerned about the veracity of statements that Gonzalez and his counsel made to this Court while briefing this issue. Gonzalez and his counsel made a series of statements that tested – if not crossed – the boundaries of candor to the Court.

One glaring example involves the estimate of the value of the claim. This Court directed Plaintiff – not once, but twice – to provide an estimate of the value of his claim. The Court did so because the value of the claim has a bearing on the likelihood that Gonzalez simply forgot it.

In response, Gonzalez and his counsel repeatedly told this Court that it was not doable – even impossible. *See* 2/11/21 Tr., at 20:24-25 (Dckt. No. 156) ("So I'm not sure it's possible to do what you're asking us to do, Your Honor."); *id.* at 22:11-12 ("Yeah, I – I don't know if that's

possible, Your Honor."); Mtn., at 3 (Dckt. No. 149) (stating that pinning down the amount of damages is "something he cannot do") (bold omitted); Statement of Juan Gonzalez, at ¶ 9 (Dckt. No. 153) (stating that he was "not able to give an exact figure on what my emotional damages are worth"); Statement of Juan Gonzalez, at ¶ 9 (Dckt. No. 168) ("I do not mean at all to be disrespectful to the Court, but the Court is asking me to do something I am not able to do. As already stated, I am not able to give an exact figure on what my emotional damages are worth.").

Those responses lacked candor. Gonzalez estimated the value of the claim in his amended bankruptcy petition in 2019, after his non-disclosure came to light. And Gonzalez received a dollars-and-cents estimate of the value of the claim as early as June 2016, more than four years before this Court directed him to provide the same thing.

Other statements give this Court pause, too. Gonzalez and his lawyer represented to this Court that he did not know that he *had* a potential claim. And he did not know the *value* of any such claim, either.

Those statements did not age well. The evidentiary hearing established that Gonzalez vigorously searched for a lawyer to bring a potential claim. And the retention agreement shows that he knew the value of any such claim, long before filing for bankruptcy.

Consider for example, the following statements. The one on the left is a statement in a submission to this Court, and the statement on the right is from the retention agreement:

| Plaintiffs' Brief | Retention Agreement |
|---|---|
| "The Court may believe that plaintiff Juan Gonzalez has known the value of his lawsuit all along and failed to tell the trustee, but that just did not happen." | "The Client has been advised and agrees that a rough initial estimate of the total value of the total claim for all Clients retaining the Attorney for this incident ranges from $**[REDACTED]** to $**[REDACTED]**, although there is no guarantee of this. The Client acknowledges agreement to this by placing his/her initials here." |
| | |
| *See* Mtn., at 4 (Dckt. No. 149). | *See* 6/7/16 Retainer for Legal Services, at 3 of 3 (Dckt. No. 191-1). |

As a second example, consider the following statements about whether Plaintiffs' counsel ever gives estimates to clients about possible damages:

| Hearing | Retention Agreement |
|---|---|
| "I *never tell clients*, you know, you could expect X amount of dollars here or Y amount of dollars, because that – I think that's irresponsible for an attorney." | "The Client has been advised and agrees that a rough initial estimate of the total value of the total claim for all Clients retaining the Attorney for this incident ranges from $**[REDACTED]** to $**[REDACTED]**, although there is no guarantee of this. The Client acknowledges agreement to this by placing his/her initials here." |
| | |
| *See* 2/11/21 Tr., at 20:21-23 (Dckt. No. 156) (emphasis added). | *See* 6/7/16 Retainer for Legal Services, at 3 of 3 (Dckt. No. 191-1). |

As a third example, consider the following statements about whether Gonzalez was aware that he had a possible claim:

| Plaintiffs' Brief | Retention Agreement |
|---|---|
| "Plaintiff did not learn that he had a *possible* lawsuit until *after he was discharged* in bankruptcy and his bankruptcy attorney did not advise him that a possible civil rights claim was an asset." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 50 (Dckt. No. 125) (emphasis added). | "The Attorney shall investigate and prosecute an action in federal district court based upon the allegations of police misconduct which have been reported and described to her." *See* 6/7/16 Retainer for Legal Services, at 3 of 3 (Dckt. No. 191-1). |

There are other problematic statements, too. Plaintiffs' counsel made all of the following statements to this Court in 2021, long after Gonzalez retained counsel in 2016:

- "Even attorneys, such as plaintiffs' attorney, who have been practicing law for a number of years, would not and could not give an exact figure for emotional damages or punitive damages." *See* Mtn., at 4 (Dckt. No. 149).

- "At the point when plaintiff Juan Gonzalez had his first meeting with the trustee in bankruptcy in early 2017, there was no lawsuit. He had not even been told by counsel that he had a viable claim. Mr. Gonzalez would not [have] been able to put a figure on an asset that *he did not even know was an asset*." *Id.* (emphasis added).

- "If he gives an *honest answer* in response to the Court's order and says he *does not know the value* of the lawsuit, the Court says it may dismiss his lawsuit." *Id.* (emphasis added).

- "At the time of my first meeting with the trustee on March 2, 2017, *I had no knowledge about the value* of my experience of police misconduct, or *whether it had a value*." *See* Statement of Juan Gonzalez, at ¶ 7 (Dckt. No. 168) (emphasis added).

- "At the time of my first meeting with the trustee on March 2, 2017, there was no lawsuit. I did not understand my complaint of police misconduct to be a 'claim.'" *Id.* at ¶ 6.

89

The Court will address this topic by separate order.  Suffice it to say that the facts, once exposed, told a different story about what transpired.

### Conclusion

The Court grants Defendants' motion for summary judgment on Count I (for the entry into the home).  The Court grants Defendants' motion for summary judgment on Count I (for the existence of the search).  The Court denies Defendants' motion for summary judgment on Count II (for the scope and duration of the search).  The Court grants summary judgment to Officer Bubalo on all claims pending against him.  The Court grants summary judgment to all Defendants on all claims by Plaintiff Gonzalez based on judicial estoppel.


Date:   September 15, 2021                    _____

                                             Steven C. Seeger
                                             United States District Judge